

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-24-2002

# Gattis v. Snyder

Precedential or Non-Precedential:

Docket 99-9006

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Gattis v. Snyder" (2002). *2002 Decisions.* Paper 40.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/40

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed January 24, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-9006

ROBERT ALLEN GATTIS, Appellant

v.

ROBERT SNYDER, Warden,
Delaware Correctional Center

On Appeal From the United States District Court
For the District of Delaware
(D.C. Civ. No. 97-cv-00619)
District Judge: Roderick R. McKelvie

Argued: July 12, 2001

Before: Becker, Chief Judge, Scirica and Greenberg,
Circuit Judges.

(Filed: January 24, 2002)

        KEVIN J. O'CONNELL, ESQUIRE
         (ARGUED)
        831 North Tatnall Street, Suite 200
        Wilmington, DE 19801

        Counsel for Appellant

          LOREN C. MEYERS, ESQUIRE
            (ARGUED)
          Chief of Appeals Division
          Department of Justice
          State Office Building
          820 N. French Street
          Wilmington, DE 19801

          Counsel for Appellee

OPINION OF THE COURT

BECKER, Chief Judge.

This is a death penalty appeal which presents, inter alia, a question as to the method of dealing with a mixed motive Batson challenge. Robert Allen Gattis, a prisoner on Delaware's death row, appeals from the judgment of the District Court denying his petition for a writ of habeas corpus. Gattis v. Snyder, 46 F. Supp. 2d 344 (D. Del. 1999). The District Court found all of his claims to be procedurally barred, meritless or noncognizable. However, it found the five claims which it addressed on the merits to meet the standards for a certificate of appealability. These claims are: (1) that trial delays denied Gattis the right to a speedy trial; (2) that his Fourteenth Amendment rights were violated by an improper peremptory challenge; (3) that trial counsel were ineffective; (4) that the sentencing court violated Gattis' constitutional rights by sentencing him under Delaware's revised death penalty even though the crime of which he was convicted occurred prior to the statute's enactment; and (5) that the Delaware Supreme Court denied him due process when it affirmed his conviction and death sentence on collateral review based on a different factual basis from that argued to the jury. Because Gattis has not asked this Court to expand the scope of the certificate of appealability to include any of the other claims he presented in his habeas corpus petition, our review is confined to those five claims.

Gattis' contention that application of the amended death penalty statute to him violates the ex post facto clause

2

because he committed the crime eighteen months prior to the enactment of the amendment has already been rejected. See Hameen v. State of Delaware, 212 F.3d 226 (3d Cir. 2000), cert. denied, 121 S. Ct. 1365 (2001). Hence we need not discuss it further. We will, however, address each of Gattis' other contentions, and, finding them without merit, will affirm. The question of particular significance is the manner of dealing with an attack on a peremptory challenge pursuant to Batson v. Kentucky, 476 U.S. 79 (1986), where the prosecutor's motives related not only to the prospective jurors' race (or gender), but also to factors that were properly considered. We hold that the state courts' application of "dual motivation" analysis to Gattis' Batson challenge did not result in a decision that was "contrary to, or involved an unreasonable application of, Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. S 2254(d)(1).

I. Facts and Procedural History

In May 1990 a Delaware Grand Jury charged Gattis with first degree murder and related crimes arising out of the shooting of his girlfriend, Shirley Y. Slay. The Office of the Public Defender assigned Richard M. Baumeister and John H. McDonald to represent Gattis. Baumeister contacted Elizabeth Dewson, the Public Defender's Office's psycho-forensic evaluator, to interview Gattis and subsequently arranged further evaluation by Cono Galliani, Ph.D. The Superior Court initially set a trial date of November 1, 1990, but granted a continuance so that Gattis could be evaluated by a neurologist. The new trial date, March 20, 1991, was again postponed so that additional medical tests could be performed on Gattis. After the court set a new trial date of May 20, 1991, the state sought a postponement, to which Baumeister did not object because Gattis' psychological and neurological examinations would not be complete until July or August. At a hearing on May 29, 1991, Gattis expressed concern at the delays but agreed to postpone trial until November 26, 1991 to give counsel more time to prepare the case.

In the interim, on November 4, 1991, Governor Castle signed Senate Substitute 1 for Senate Bill 79, amending

Del. Code Ann. tit. 11, S 4209 relating to the imposition of the death penalty; the terms of the amendments would apply to all defendants tried or sentenced after its effective date. Pursuant to the amended statute, at the penalty phase the jury recommends whether to impose the death penalty based on its response to the two questions set forth in the margin.[1] The court is not bound by the jury's recommendation. Rather, section 4209, as amended, requires the judge to impose a death sentence after considering the recommendation of the jury if the judge finds:

> a. Beyond a reasonable doubt at least 1 statutory aggravating circumstance; and

> b. By a preponderance of the evidence, after weighing all relevant evidence in aggravation or mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender, that the aggravating circumstances found by the court to exist outweigh the mitigation circumstances found by the court to exist.

Del. Code Ann. tit. 11, S 4209(d)(1)a-b (1995). Pursuant to the version of S 4209 in existence before November 4, 1991, the death penalty could not be imposed unless the jury had unanimously recommended that sentence.

In the wake of this enactment, and pursuant to Delaware Supreme Court Rule 41, the Delaware Superior Court certified questions of law to the Delaware Supreme Court

_____

1. The questions are:

> 1. Whether the evidence shows beyond a reasonable doubt the existence of at least 1 aggravating circumstance as enumerated in subsection (e) of this section; and

> 2. Whether, by a preponderance of the evidence, after weighing all relevant evidence in aggravation or mitigation which bear upon the particular circumstances or details of the commission of the offenses and the character and propensities of the offender, the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist.

Del. Code Ann. tit. 11, S 4209(c)(3)a.1-2 (1995).

4

concerning whether the amended statute violated the United States Constitution or the Delaware Constitution. Defendants awaiting trial for first degree murder whose alleged crimes occurred before the effective date of the new law were given an opportunity to participate in the certification process. Gattis participated. The Superior Court issued an Administrative Directive postponing all trials and penalty hearings in capital first degree murder cases while the Delaware Supreme Court considered the certified questions. In February 1992 the Delaware Supreme Court responded, finding that section 4209, as amended, did not violate either constitution. State v. Cohen, 604 A.2d 846 (Del. 1992).

Meanwhile, in January 1992, the Office of the Public Defender moved for leave to withdraw as counsel. The court granted the motion and appointed Howard F. Gillis to represent Gattis, but Gillis withdrew from the case due to a health problem. On March 5, 1992, the court appointed Jerome M. Capone to represent Gattis. Five days later, the court scheduled trial to commence on September 9, 1992. On March 30, 1992, the court appointed Joseph M. Bernstein as co-counsel.

Trial finally commenced on September 1, 1992. On September 22, 1992, the jury found Gattis guilty of first degree murder, first degree burglary, possession of a deadly weapon by a person prohibited, and two counts of possession of a deadly weapon during the commission of a felony. After the penalty hearing, the jury found unanimously that the state had proved beyond a reasonable doubt the existence of both of these statutory aggravating circumstances. Ten out of twelve jurors also found, by a preponderance of the evidence, that the aggravating circumstances outweighed the mitigating circumstances. Based on his review of the jury's recommendation and additional argument from the parties, the trial judge determined that the state had established beyond a reasonable doubt the existence of two statutory aggravating circumstances and that the aggravating circumstances outweighed the mitigating circumstances. Accordingly, on October 29, 1992, the Court ordered that Gattis be executed by lethal injection.

5

On direct appeal, Gattis asserted various claims of error relating to the admissibility of evidence, that the death penalty was not proportionate to the offense, and that the jury was not randomly selected. After remand for an evidentiary hearing on one issue, the Delaware Supreme Court affirmed. Gattis v. State, 637 A.2d 808 (Del.), cert. denied sub nom. Gattis v. Delaware, 513 U.S. 843 (1994).

Gattis then moved for post-conviction relief, which was denied, and also filed an amended motion for post-conviction relief.2 The Superior Court found all of Gattis' claims to be procedurally defaulted and/or meritless. However, the court granted Gattis' motion for reargument with regard to his claim that counsel was ineffective for failing to investigate an accidental shooting defense before trial. Unpersuaded, the court later denied Gattis' motion for post-conviction relief.

On appeal of his collateral challenge, Gattis argued, inter alia, that a forensic scientist, Stuart H. James, would have testified at trial that the prosecution's theory of the case was physically impossible. After argument, the Delaware Supreme Court remanded the matter to the Superior Court to determine whether the state's theory was physically impossible. The court also directed the Superior Court to consider whether the state improperly excluded a potential

_____

2. Gattis presented the following claims: (1) the state withheld evidence and counsel was ineffective for failing to raise the issue at trial or on appeal; (2) he was denied his right to a speedy trial, resulting in his being sentenced under the amended death penalty statute; (3) counsel was ineffective for failing to pursue this claim at trial and on direct appeal; (4) persons opposed to the death penalty were excluded for cause from the jury; (5) the state improperly used peremptory challenges to remove persons opposed to the death penalty; (6) the state made prejudicial remarks concerning inadmissible and inflammatory evidence during its opening statement; (7) irrelevant and prejudicial evidence was admitted; (8) the state made improper and prejudicial remarks during its closing statement; (9) counsel were ineffective for failing to perform an investigation to develop his account of the events until mid-way through the trial; (10) the death penalty statute violates the Eighth and Fourteenth Amendments; and (11) sentencing him under the amended death penalty statute violated his rights to due process and equal protection under the Fourteenth Amendment.

6

juror, Wilfred Moore, for gender-related reasons. The Superior Court found both claims meritless. After the Delaware Supreme Court affirmed, Gattis v. State , 697 A.2d 1174 (Del. 1997), cert. denied sub nom. Gattis v. Delaware, 522 U.S. 1124 (1998), the Superior Court rescheduled Gattis' execution for January 9, 1998.

On November 25, 1997, Gattis filed in the District Court for the District of Delaware a petition for a writ of habeas corpus in which he raised ten claims. The District Court granted Gattis' motions for a stay of execution, appointment of counsel and expansion of the record, but denied his motion for an evidentiary hearing. Importantly, after the respondent filed its answering brief, Gattis filed the affidavit of Thomas J. Saunders, a capital litigation attorney, in which he stated inter alia that Baumeister's failure to object to postponing Gattis' trial, even though he was on notice that Senate Bill 79 could affect Gattis' rights, and his failure to inform Gattis that the proposed changes to the death penalty statute could affect his rights after a certain date, compromised Gattis' right to counsel and prejudiced his defense. The District Court found all of Gattis' claims to be meritless, procedurally defaulted, or non-cognizable and denied his petition. Gattis v. Snyder, 46 F. Supp. 2d 344 (D. Del. 1999). Nevertheless, as noted above, the court issued a certificate of appealability with regard to the five claims which it denied on the merits. Gattis v. Snyder, No. 97-619 (D. Del. March 25, 1999). Gattis filed a motion for reargument, which the court denied. Gattis v. Snyder, No. 97-619 (D. Del. August 26, 1999). This timely appeal followed. Because Gattis has not sought to expand the scope of the District Court's certificate of appealability, our review is limited to those five claims.

II. Standard of Review

Gattis' habeas corpus petition was filed after April 1996. As a result, the District Court's review of Gattis' claims was limited by AEDPA. Pursuant to 28 U.S.C. S 2254(d):

>       An application for a writ of habeas corpus on behalf of
>       a person in custody pursuant to the judgment of a

> State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

In Williams v. Taylor, 529 U.S. 362 (2000), the Court held that "[u]nder the `contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. at 412-13. A state court decision is an "unreasonable application" if the court identifies the correct governing legal rule from the Supreme Court's cases but unreasonably applies it to the facts of the particular case or if the state court either unreasonably extends a legal principle from the Supreme Court's precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. Id. at 407. This is an objective test. Id. at 410. A federal court may not grant a writ of habeas corpus merely because it concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Jermyn v. Horn, 266 F.3d 257, 281-282 (3d Cir. 2001). "A contrary holding would amount to de novo review which we have held is proscribed by the AEDPA." Werts v. Vaughn, 228 F.3d 178, 197 (3d Cir. 2000), cert. denied, 121 S. Ct. 1621 (2001). We review the District Court's application of section 2254(d) de novo. Banks v. Horn, 271 F.3d 527 (3d Cir. 2001).

III. Trial Delay

A. Introduction

In his post-conviction motion Gattis argued that he was denied his rights to a speedy trial, due process, and equal protection as result of the delays preceding his trial, and

that trial counsel were ineffective for failing to pursue his right to a speedy trial. Gattis contends that as a result of the delay he was sentenced under the revised death penalty statute and was prejudiced because under the previous law he could not have received the death penalty if, as here, the jury was not unanimous in recommending the death penalty. In his brief to the Delaware Supreme Court Gattis presented the claim in a mere two pages, offering little argument, asserting without explanation that the 28 month period of delay is "presumptively prejudicial;" that "the delays occasioned by Gattis first counsels' continued requests for medical testing were unreasonable and highly prejudicial;" that counsels' "lack of diligence" caused "delay which may cost him his life;" and that the delay "occasioned by the malfeasance of Gattis' public defenders should not be attributed to Gattis in the court's speedy trial analysis."

The Superior Court found the claim procedurally defaulted but addressed it on the merits because Gattis had received the death penalty. Applying the four factors set forth in Barker v. Wingo, 407 U.S. 514, 530 (1972) -- the length of the delay, the reasons for the delay, the defendant's assertion of his right, and prejudice to the defendant -- the court found the claim meritless. Most of the delay was occasioned by counsels' requests for continuances in order to obtain medical testing for Gattis. The court determined that those continuances could not be attributed to the state and that they should be subtracted from the delay for purposes of a speedy trial analysis. Further delay was caused by the temporary stay pending a determination of questions certified to the Delaware Supreme Court, a process in which Gattis participated along with eight other defendants. Thus, rather than asserting his right to a speedy trial, "he took affirmative steps guaranteed to prolong the pretrial waiting period." State v. Gattis, 1995 WL 790961 at *7 (Del. Super. December 28, 1995). Finally, the court rejected Gattis' prejudice argument.

The Delaware Supreme Court made no reference to procedural default, addressing this claim exclusively on the merits. In doing so, the court essentially followed the

9

Superior Court's analysis, rejecting Gattis' assertions of prejudice for lack of substantiation. "Because Gattis fails to make and substantiate specific allegations of actual prejudice, and because we find no evidence of prejudice to Gattis resulting from the delay, we conclude that the Superior Court did not abuse its discretion in denying Gattis' motion. . . ." Gattis v. State, 697 A.2d at 1180.

In his habeas corpus petition, Gattis asserts that his right to "a speedy trial was violated when he was not tried for an inordinately long time after indictment, prejudicing his right to a fair trial. . . ." As in state court, in his opening brief in support of his petition Gattis complains that counsels' continued requests for worthless medical testing were unreasonable and prejudicial, resulting in an eighteen-month delay which should not be attributed to Gattis. In his reply brief, Gattis responded to the state's argument that the claim was defaulted by arguing that counsels' ineffectiveness is cause for the default. He complains that counsel failed to pursue his speedy trial claim, that counsel seemed unaware that an amendment to the death penalty statute was pending, and that state court decisions prevented adequate factual development of the issue, resulting in insufficient record for its proper resolution.

Gattis also filed the Saunders affidavit, which notes, inter alia, that the amendment to the death penalty statute had been introduced in the Delaware Senate on March 26, 1991 and that on March 31st the Wilmington News Journal had noted that the bill had been sent to the judiciary committee. Nevertheless, counsel evidently did not know of, or ignored, the possible change in the law; he neither mentioned it at the May hearing nor discussed its significance with Gattis. The affidavit opines that adequate assistance of counsel, especially in a death penalty case, requires counsel to be aware of any law that may affect his client's interests, especially the sorts of changes contemplated by the amendment in question here. Moreover, the affidavit represents that there was no need for a postponement beyond July or August.

Because the Delaware Supreme Court had addressed the claim solely on the merits, the District Court did so as well,

10

rather than dismissing the claim as defaulted at the state's request. The court found the claim meritless because the Delaware Supreme Court's analysis of the claim was not contrary to clearly established federal law. Gattis v. Snyder, 46 F. Supp. 2d at 372. Because the Superior Court expressly addressed the claim on the merits regardless of whether it was procedurally defaulted, and because the Delaware Supreme Court addressed the claim exclusively on the merits without any reference to procedural default, we agree with the District Court that the claim is not defaulted. Harris v. Reed, 489 U.S. 255 (1989).

B. Proper Characterization of the Claim

On reading Gattis' initial brief, we found it puzzling that Gattis cast this claim in terms of a violation of his right to a speedy trial rather than of his right to effective assistance of counsel pursuant to Strickland v. Washington , 466 U.S. 668 (1984). Accordingly, at oral argument we asked Gattis' able federal habeas attorney whether his first claim might not be better understood as an ineffectiveness claim, and ordered the parties to address in supplemental briefing whether such an ineffectiveness claim had been presented to the District Court; whether it had been exhausted in state court; whether it was procedurally defaulted; and whether it was within the scope of the certificate of appealability. In his supplemental brief Gattis argues that he did not exhaust the claim in state court, that the claim is not procedurally defaulted, and that it is implicitly included in the certificate of appealability; he does not address whether the claim was presented to the District Court. In contrast, the state argues that the claim is procedurally barred because it was not presented in state court and because no further state court review is available to Gattis. Moreover, Gattis did not present the claim to the District Court, so that the certificate of appealability should not be deemed to include it.

As our outline of the procedural history of Gattis' speedy trial claim indicates, the claim he presented to the District Court is essentially the same as the claim he presented in state court. As a result, he exhausted state remedies with regard to that claim. Ipso facto, if Gattis' claim as presented

11

in the District Court should be construed as an ineffectiveness claim, the claim, so construed, is also exhausted. Conversely, if it was not exhausted, it was not presented in the District Court either; it makes no sense to construe his claim as an ineffectiveness claim in state court but not in federal court, and vice versa.

The problem for Gattis is that even though there seems to be a potential ineffectiveness claim struggling to escape from the confines of his speedy trial claim, he never released it by presenting a coherent, properly articulated claim under Strickland in either state court or in his federal habeas corpus petition. As Gattis acknowledges in his supplemental brief, "[b]oth the legal theory and the facts underpinning the federal claim must have been presented to the state courts . . . and the same method of legal analysis must be available to the state court as will be employed in the federal court." Evans v. Court of Common Pleas, 959 F.2d 1227, 1231 (3d Cir. 1992), cert. petition dismissed, 506 U.S. 1089 (1993). Based on Gattis' submissions in state court, described above, we are constrained to agree with his admission that he"did not . . . serve fair notice [on the state courts] that he was asserting an ineffective assistance of counsel claim within his speedy trial claim." But neither did he present such a claim to the District Court. It is not sufficient, as Gattis implies, that the District Court had the benefit of Saunders' affidavit. Gattis did not present an appropriate ineffectiveness claim except as "cause" for the procedural default asserted by the state and did not, along with Saunders' affidavit, file a motion to amend his petition to include one. We cannot retroactively amend Gattis' petition on his behalf.

But even if the claim had been exhausted and presented to the District Court we would likely find it without merit. As we have stated, "there is no general duty on the part of defense counsel to anticipate changes in the law," Gov't of the Virgin Islands v. Forte, 865 F.2d 59, 62 (3d Cir. 1989), while the reasons given by the Superior Court for not finding prejudice under Barker would also apply to an

12

ineffectiveness claim. State v. Gattis, 1995 WL 790961 at *8
(Del. Super. 1995).3

C. The Merits

We agree with the District Court that the state court
decisions are not contrary to clearly established federal law.
Nor do they involve an unreasonable application of clearly
established federal law. Aside from the reasons provided by
those courts, we note that Gattis' claim suffers from a
perhaps more fundamental defect: the right to a speedy
trial essentially protects defendants against delays caused
by the government. If the delay is attributable exclusively to
the defendant, "he will be deemed to have waived his
speedy trial rights entirely." United States v. Manning, 56
F.3d 1188, 1195 (9th Cir. 1995). Similarly, portions of the
delay which are attributable to the defendant or his counsel
"will not be considered for purposes of determining whether
the defendant's right to a speedy trial has been infringed."
Wells v. Petsock, 941 F.2d 253, 258 (3d Cir. 1991), cert.
denied sub nom., 505 U.S. 1223 (1992); United States v.
Dent, 149 F.3d 180, 183 (3d Cir. 1998), cert. denied, 525
U.S. 1085 (1999). Because the only delays of which Gattis
complains were caused by his own counsel, there is no
merit to his speedy trial claim.

IV. The Batson Issue

During jury selection the prosecutor exercised a
peremptory challenge against an elderly African–American
male, Wilfred Moore. According to Gattis, this was done
merely because Moore was a man, in violation of J.E.B. v.
Alabama ex rel. T.B., 511 U.S. 127 (1994) (holding that
peremptory challenges may not be exercised solely on the
basis of gender). But that is misleading. Rather, the

_____

3. We note that in his filings in this Court Gattis seems to argue that
the
claim was presented as a speedy trial claim because the state courts
would not allow him an opportunity to develop a factual basis for the
claim. We do not find this argument persuasive because Gattis blamed
counsel for the delay from the outset. It thus appears that what Gattis
lacked was less a detailed factual record than the appropriate legal
analysis.

13

following exchange took place between Moore and the prosecutor:

> Q: If the facts and circumstances so warranted, could you recommend a sentence of death?
>
> A: I don't know, sir.
>
> Q: . . . . If the facts and circumstances so warrant, could you recommend a sentence of life imprisonment?
>
> A: Yes, sir, I could.
>
> Q: . . . . Now, you did indicate that you would follow the Court's instructions on the law whether you agreed with that law or not. . . . Taking those instructions in mind, then, and taking into account all the facts and circumstances, now, if the facts and circumstances so warrant and if the Court's instructions so permit, could you recommend a sentence of death?
>
> A: It's like going to war. I don't know if I-- you know, until the time comes, truly in my heart would know if I could bring a bullet up there. I don't know until the time comes.
>
> Q: Okay. Philosophically, generally, you're not opposed to the death penalty?
>
> A: I believe in the death penalty, but I don't know if I could be the one to say, yes, sentence this defendant to death until the time comes.

The state then asked the court to strike Moore for cause. The court found that Moore's responses did not meet the standard in Witherspoon v. Illinois, 391 U.S. 510 (1968) and declined to exclude him for cause. Accordingly, the state exercised a peremptory challenge against Moore. After Moore was excused, the state sought the court's permission to make a record of its reasons for the strike, which were as follows:

> Number one, I believe that this juror was very, very conservative in his application of the possible application of the death penalty [sic]. He answered very

14

quickly yes to the possibility of imposing a life sentence under the appropriate facts and circumstances, yet, to our belief, had a very difficult time in answering whether or not he could impose the death penalty under the appropriate circumstances. He seemed very, very conservative in the application of the death penalty.

Number two, he is an older gentleman and we have, I believe, four or five older gentlemen on the jury panel already. And I would suggest that it's the state's point of view that we would prefer to have some more women on the jury.

Gattis brought this claim during post-conviction proceedings. On appeal, the Delaware Supreme Court remanded the matter to the Superior Court to make factual findings and conclusions of law regarding this issue.4 On remand, the state argued that even though one of the prosecutor's reasons for the challenge was based on gender, the paramount reason was Moore's reluctance to impose the death penalty. The Superior Court noted that the Supreme Court has held in other areas of equal protection jurisprudence that an action motivated in part by an impermissible reason will withstand challenge if the same action would have been taken in the absence of the impermissible motivation.5 Relying on United States v. Tokars, 95 F.3d 1520 (11th Cir. 1996), cert. denied, 520 U.S. 1151 (1997); Wallace v. Morrison, 87 F.3d 1271 (11th Cir.), cert. denied, 519 U.S. 1044 (1996); and United States v. Darden, 70 F.3d 1507 (8th Cir. 1995), cert. denied, 517 U.S. 1149 (1996), the court applied the following "dual motivation" test: after the defendant makes a prima facie showing of discrimination, the state may raise the affirmative defense that the strike would have been exercised on the basis of the gender-neutral reasons and in the absence of the discriminatory motive. If the state makes such a showing, the peremptory challenge survives constitutional scrutiny.

_____

4. It also remanded for similar proceedings concerning the state's theory of the murder. See infra at 20-21.

5. The court cited Mt. Healthy City Sch. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977).

The Superior Court discerned no intent to discriminate against men. At the time Moore was struck, four men and three women had been selected for the jury. The state had used four of its challenges to remove two men and two women, and after Moore was removed the state used two strikes to remove men and three to remove women. In its final form the jury consisted of six women and six men, with three women and one man as alternates. Moreover, the state's explanation for excluding Moore focused on his attitudes towards the death penalty. The Superior Court concluded:

> There is nothing in the record which indicates that the prosecution was driven by invidious gender-based stereotypes. . . . Based on the totality of the circumstances, the Court finds that the State has carried its burden of showing that the prosecutor would have challenged Moore even in the absence of any gender-related reason. In regard to the prosecutor's gender-based motivation, the Court is satisfied that this consideration was de minimis. The prosecutor stated that several men had already been selected and that he wanted to select a few more women. On its face, this statement indicates that the prosecutor was trying to seat a jury with a diverse and representative character. . . . In light of the fact that four men had already been selected for Gattis' jury when Moore was challenged, it is not plausible that the prosecutor's stated desire for a mix of men and women was a pretext for a desire to exclude men because of invidious, archaic and overbroad stereotypes.

State v. Gattis, 1996 WL 769328 *6 (Del. Super.). Accordingly, the Superior Court found the claim meritless. Echoing the Superior Court's reasoning, the Delaware Supreme Court found "no abuse of discretion in the Superior Court's determination." Gattis v. State, 697 A.2d at 1184.

The District Court found that Gattis had not presented clear and convincing evidence to overcome the presumption of correctness afforded state courts' factual findings by 28 U.S.C. S 2254(e)(1) and that the Delaware Supreme Court's rejection of Gattis' claim was "not contrary to clearly

16

established federal law, and did not rely on an unreasonable application of the facts." Gattis v. Snyder, 46 F. Supp. 2d at 379. The court concluded that the claim fails pursuant to 28 U.S.C. S 2254(d).

The Supreme Court has not addressed a case involving mixed motives in jury selection. Accordingly, we apply the "unreasonable application" prong of S 2254(d)(1) rather than the "contrary to" prong. Jermyn v. Horn , 266 F.3d 257 (3d Cir. 2001). As noted above, a state court decision is an "unreasonable application" of federal law if the court identifies the correct governing legal rule from the Supreme Court's cases but unreasonably applies it to the facts of the particular case or if the state court either unreasonably extends a legal principle from the Supreme Court's precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. Williams v. Taylor, 529 U.S. at 407. In addressing Gattis' claim, the Superior Court correctly identified the main Supreme Court decisions -- Batson, J.E.B., and Mt. Healthy-- and, citing Wallace and Tokars, applied mixed motive analysis.

In Howard v. Senkowski, 986 F.2d 24 (2d Cir. 1993), the court addressed for the first time an attack on a peremptory challenge pursuant to Batson v. Kentucky, 476 U.S. 79 (1986), where the prosecutor's motives were "mixed," i.e., involved not only the prospective juror's race but also other factors that were properly considered. Because the reasoning in Batson fell "squarely within the [Supreme Court's] tradition of equal protection jurisprudence," id. at 26, the court began its analysis by noting that:

> In the realm of constitutional law, whenever challenged action would be unlawful if improperly motivated, the Supreme Court has made it clear that the challenged action is invalid if motivated in part by an impermissible reason but that the alleged offender is entitled to the defense that it would have taken the same action in the absence of the improper motive. See Mt. Healthy City School Board of Education v. Doyle , 429 U.S. 274, 284-87, 97 S.Ct. 568, 574-76, 50 L.Ed.2d 471 (1977); Village of Arlington Heights v.

17

Metropolitan Housing Development Corp., 429 U.S. 252, 270 n. 21, 97 S.Ct. 555, 566 n. 21, 50 L.Ed.2d 450 (1977).

Id. at 26. The court concluded:

Batson challenges may be brought by defendants who can show that racial discrimination was a substantial part of the motivation for a prosecutor's peremptory challenges, leaving to the prosecutor the affirmative defense of showing that the same challenges would have been exercised for race-neutral reasons in the absence of such partially improper motivation. In concluding that dual motivation analysis applies to a Batson challenge, we do no more than apply that analysis precisely as previously enunciated by the Supreme Court in prior dual motivation cases such as Arlington Heights. . . . [O]nce the prosecutor's partially improper motivation had been established, Howard was entitled to prevail unless, under dual motivation analysis, the prosecutor could sustain his burden of showing that he would have exercised his challenges solely for race-neutral reasons.

Id. at 30.

Other courts have followed suit, applying mixed motive analysis to situations where not only race, but also gender was a reason for excluding a potential juror. See, e.g., Tokars (gender); Wallace (race); Darden (youth, inexperience, and alleged young black female tendency "to testify on behalf and be more sympathetic toward individuals who are involved in narcotics"); Jones v. Plaster, 57 F.3d 417, 421-22 (4th Cir. 1995) (race -- applying dual motivation but remanding to District Court for clarification of findings regarding whether the strike was exercised for a discriminatory purpose and whether it would have been exercised in the absence of the discriminatory purpose). We find the reasoning of these cases persuasive.

Because we agree with Howard and the other cases cited that mixed motive analysis is appropriate in this context, we cannot conclude that the Superior Court unreasonably extended a legal principle from the Supreme Court's precedent. On the facts, the Superior Court's discussion,

18

quoted supra at 16, rings true. We thus reject Gattis' contention that the record "clearly and convincingly" rebuts the Superior Court's factual conclusions, and hence we do not agree that the Superior Court (and, ipso facto, the Delaware Supreme Court) failed the "unreasonable application" prong of section 2254(d). Accordingly, there is no merit to this claim.

## V. Counsel's Failure to Investigate

Gattis complains that counsel failed to develop his version of the facts, to investigate the relevant facts, or to interview relevant witnesses. He argues that if counsel had investigated the crime scene properly they could have shown at trial that the state's account of the crime was implausible. The government argued to the jury that Gattis returned to Slay's apartment in a fit of jealous rage, kicked in the door, walked up to her and shot her between the eyes, "execution-style." However, the fact that the victim's feet prevented the door from opening more than twelve inches means that he could not have walked up to her and shot her. Rather, it supports Gattis' contention that the gun went off accidentally as he was kicking in the door. Even though counsel could have learned of this before trial, they did not realize that Gattis' story was plausible until, several days into the trial, they entered Slay's apartment for the first time (they had visited the building before trial but had not entered the apartment). Gattis places much reliance on James' testimony that Gattis' version of what happened was more plausible than the state's. He maintains that counsels' inadequate performance affected not only the guilt phase, but also sentencing: the nature of the killing was central to the State's efforts to persuade the jury and sentencing judge that death was the appropriate punishment.

The Superior Court found that Gattis met neither prong of Strickland. The court denied Gattis' request for a hearing. It placed greater credence in counsels' affidavits than Gattis', and concluded that counsel took reasonable investigative measures in light of the information given them by Gattis. The court also concluded that even if counsels' performance was unreasonable, Gattis had not

19

shown prejudice, in part because "his version of the incident . . . [is] simply unworthy of belief.. . . It is inconceivable that even one juror would have accepted the accident defense in this case." State v. Gattis, 1995 WL 790961 *19-20 (Del. Super.).

On appeal, Gattis argued that James would testify, if given the opportunity, that the prosecution's case was unsupportable. The Delaware Supreme Court remanded the case to the Superior Court to hold an evidentiary hearing to determine whether James really would so testify. Despite concluding that the threshold standard for holding a hearing was not met, the Superior Court held a hearing to allow the parties to present evidence in support of their respective positions. After a detailed analysis of that evidence, the Superior Court concluded that there was no prejudice to Gattis. James would have testified that Gattis' story was more plausible than the state's, but would also have stated that he could not determine certain crucial facts, could not confirm Gattis' version of the murder, and could not disprove the state's theory of the murder.

> Furthermore, nothing in James's assertions could dispel the impression of an angry, violent man who intentionally set out to kill Shirley Slay by shooting her in the face in an execution-style slaying. It is difficult to conceive that James' testimony would have elevated the accident defense to a plausible level.

State v. Gattis, 1997 WL 127007 *6 (Del. Super.). After reviewing the evidence, the Delaware Supreme Court found that the Superior Court did not abuse its discretion in so concluding. Gattis v. State, 697 A.2d at 1184-86.

The District Court found that Gattis had not offered any evidence that counsels' performance was "unreasonable or egregious, or caused prejudice." Gattis v. Snyder, 46 F. Supp. 2d at 380. Furthermore, the District Court found "that the Delaware Supreme Court did not unreasonably apply clearly established federal law, and did not base its decisions on an unreasonable application of the facts." Id.

We agree. The state courts correctly identified the relevant Supreme Court precedent -- Strickland  -- and accurately described the two familiar tests which the

20

prisoner must pass to obtain relief, i.e., show that counsel's performance was objectively unreasonable and "that there is a reasonable probability that, but for counsel's unprofessional errors the result of the proceeding would have been different." Strickland, 466 U.S. at 694. Moreover, the state courts' application of Strickland to the facts before them was reasonable. Counsel presented Gattis' account of the facts at trial: not only did Gattis testify that he did not mean to pull the trigger when he fired the fatal shot, but one of the central questions -- how far the door to Slay's apartment was open -- was explored in the testimony of three witnesses, while a fourth explained the size and layout of the doorway area. As a result, counsel persuaded the court to instruct the jury on lesser included offenses and to instruct the jury that if they found the shooting to have been accidental, they must acquit Gattis of the murder charge. In closing argument counsel insisted that when the gun went off Gattis could not have been in the apartment but in the hallway attempting to enter. Thus, the only question is whether the testimony of James or a similar expert would be reasonably likely to have made the jury believe Gattis' explanation. We agree with the Superior Court that this seems unlikely.

The state courts and District Court did not separately address the sentencing prong of Gattis' claim, doubtless because there was no need to: its success turns on the success of the claim that counsel did not adequately prepare for trial. The sentencing prong also faces additional problems of its own. Gattis argues at length in his reply brief that the state's contention, and the sentencing court's finding, that the murder was "execution-style" played an important role in determining his sentence. However, the record does not support this contention. The government relied on two statutory aggravating factors -- the murder occurred during the commission of a burglary, and Gattis had previously been convicted of a violent felony-- and offered evidence concerning these non-statutory aggravating circumstances: the details of the commission of the offense, including Gattis' relationship with Slay, Gattis' propensity towards violence and threats of violence, victim impact, Gattis' lack of respect for authority, and his conduct while on court supervision. In its sentencing opinion the court

21

referred to the crime as "in essence, an execution carried out because of the defendant's misplaced and ill-conceived notions of infidelity on the part of Shirley Y. Slay, and because Ms. Slay, tired of the abuse to which she had for years been subjected at the hands of the defendant, was attempting to start a new life with her daughter. . . ." State v. Gattis, 1992 WL 358030 *3 (Del. Super.) The court emphasized that the murder was cold-blooded, with "no pretense of moral or legal justifications," and that there was nothing to indicate that it was a crime of passion or an impulsive act caused by serious emotional disturbance. It "was the culmination of years of torment, mental torture and physical abuse at the hands of one who selfishly sought her domination and subjugation." Id.

Thus, it seems clear that when the court referred to the murder as an execution, this was a summary of all the other factors mentioned, including the reasons for the murder. That it was "execution-style" was not mentioned by the court at all, either in its description of the aggravating factors or in its description of the balancing process. Id. at *13. Central to the court's balancing was the evidence that Gattis was "a manipulative, dominant, and violence-prone assaultive male who treated Shirley Y. Slay as a mere chattel, a piece of property to control as he saw fit." Id. at *14. In light of the court's reasoning, we conclude that providing an expert to argue that even if the murder was intentional it was not "execution-style" is not likely to have made any difference to the outcome at sentencing.

VI. Denial of Due Process on Post-conviction Review

As described above, on post-conviction review, Gattis argued to the Delaware Supreme Court with regard to his ineffectiveness claims that James would, if given the chance, testify that the prosecution's theory of the case was physically impossible. On remand, at the evidentiary hearing the government presented video and testimony to show that even if the apartment door had been open only twelve inches it would have been possible for Gattis to reach around the door and shoot her. As noted above, the state courts found Gattis' ineffectiveness claim meritless.

22

Based on these facts, in his habeas corpus petition Gattis claims that his due process rights "were violated when his conviction and death sentence were affirmed on state postconviction review on a theory not originally presented to the jury or the court that tried and sentenced him." According to Gattis, at trial the state argued that Gattis entered Slay's apartment and shot her face-to-face, not that he reached around the door and shot her. He relies on Dunn v. United States, 442 U.S. 100, 106 (1979) ("To uphold a conviction on a charge that was neither alleged in an indictment nor presented to a jury at trial offends the most basic notions of due process"). As far as we can determine, this claim has not been presented to the state courts and, thus, is unexhausted.6 However, because we agree with the District Court that the claim is meritless, and because the District Court could have dismissed the claim as meritless regardless of whether it was exhausted pursuant to section 2254(b)(2), we shall not vacate the District Court's judgment and remand for further proceedings with regard to this claim.

The District Court found the claim meritless because Gattis' conviction and sentence are supported by either a theory that he shot Slay face-to-face at close range or a theory that he reached around the door and shot her at close range. The District Court also found that the state courts did not sustain Gattis' conviction and sentence on post-conviction review on different facts or on a different theory than was presented to the jury. The Delaware Supreme Court stated that "the State never presented testimony from its witnesses nor offered any argument by prosecutors asserting that the door was fully open when the face-to-face confrontation took place," Gattis v. State, 697 A.2d at 1185, a finding of fact presumed correct because Gattis has not provided clear and convincing

_____

6. The District Court states that Gattis presented this argument to the Delaware Supreme Court as one of ineffective assistance of trial counsel, evidently concluding that that would be sufficient for exhaustion purposes. Aside from the fact that it would not be sufficient (because it involves a completely different legal theory, Duncan v. Henry, 513 U.S. 364 (1995)), we do not see in the record where it was expressly presented to the Delaware Supreme Court.

evidence to the contrary as required by section 2254(e)(1). Moreover, both Dunn and the decision by the First Circuit Court of Appeals on which Gattis also relies, Cola v. Reardon, 787 F.2d 681 (1st Cir.), cert. denied, 479 U.S. 930 (1986), involved a failure to charge the defendant in the indictment for the specific acts for which he was convicted, which is not the case here.

The fundamental flaw in Gattis' argument is that in the decisions of which he complains the state courts did not "uphold [his] conviction on a charge that was neither alleged in an indictment nor presented to a jury at trial." Dunn, 442 U.S. at 106. The allegedly different theory of guilt was not presented on direct appeal in support of his conviction but in the course of a post-conviction hearing held in connection with his claim that counsel was ineffective for failing to present expert testimony concerning the implausibility of the state's account of the murder. The Superior Court and Delaware Supreme Court did not affirm his conviction based on the state's theory but merely found his ineffectiveness claim unpersuasive. The state's theory played a small role, if any, in the courts' reasoning. In this context Dunn and Cola are simply not applicable.7

* * * *

In conclusion, we find no merit in any of Gattis' claims.

_____

7. Even if the decisions of which Gattis complains were on direct appeal, his claim would still be meritless. The indictment charged Gattis with one count of first degree murder, the killing of Shirley Slay. It did not charge him with killing her in a particular manner. Moreover, Gattis was not convicted of this murder on the basis of evidence that he murdered someone else or committed a different crime; his conviction was not affirmed on the basis of evidence that he murdered someone else; and the evidence used to support the government's different accounts (to the extent that they are different) of what happened is exactly the same in each case. Indeed, it is unclear that there was a different "theory" here in the sense at issue in Dunn and Cola ; the only variation concerns precisely how Gattis killed Slay: did he kick open the door, walk up to Slay and shoot her at close range between the eyes or kick open the door and shoot her at close range between the eyes at the door, perhaps by reaching around it?

24

Accordingly, the Order of the District Court denying the application for a writ of habeas corpus will be affirmed.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit