

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-14-2003

# Rico v. Leftridge-Byrd

Precedential or Non-Precedential: Precedential

Docket No. 01-4150P

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Rico v. Leftridge-Byrd" (2003). *2003 Decisions.* Paper 299.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/299

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed August 14, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-4150

JOSEPH RICO,
                              Appellant

v.

MARY LEFTRIDGE-BYRD;
THE DISTRICT ATTORNEY OF THE
COUNTY OF PHILADELPHIA;
THE ATTORNEY GENERAL OF THE
STATE OF PENNSYLVANIA

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
D.C. Civil No. 00-cv-04841
District Judge: The Honorable William H. Yohn, Jr.

Submitted Under Third Circuit LAR 34.1(a)
April 7, 2003

Before: BECKER,* BARRY and BRIGHT,**
*Circuit Judges*

(Opinion Filed: August 14, 2003)

---

* Judge Becker completed his term as Chief Judge on May 4, 2003.

** The Honorable Myron H. Bright, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

F. Emmett Fitzpatrick, Jr., Esq.
NiaLena Caravasos, Esq.
F. Emmett Fitzpatrick Law Offices
6th & Chestnut Streets
926 Public Ledger Building
Philadelphia, PA 19106

*Attorneys for Appellant*

Marilyn F. Murray, Esq.
Office of the District Attorney
1421 Arch Street
Philadelphia, PA 19102

*Attorney for Appellees*

## OPINION OF THE COURT

BARRY, *Circuit Judge*:

The issue before us is whether the Pennsylvania Supreme Court's decision upholding Joseph Rico's conviction and sentence against a *Batson* challenge based on the prosecutor's use of peremptory challenges to strike Italian-American prospective jurors was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States.[1]

## I.

On February 21, 1992, Joseph Rico was convicted by a jury in the Court of Common Pleas of Philadelphia County of first-degree murder and criminal conspiracy, and was sentenced to life imprisonment. Rico filed post-sentence motions, one of which invoked *Batson v. Kentucky*, 476 U.S. 79 (1986), alleging that the prosecutor exercised seven of his twenty peremptory challenges against Italian-

---

1. In this opinion, all references to the "Supreme Court" refer to the Supreme Court of the United States. All references to the Pennsylvania Supreme Court will be so indicated.

American prospective jurors in violation of the Equal Protection Clause. Rico, we note, is not Italian-American but, for reasons of which we are not aware, changed his surname from Gavel to Rico. The trial court denied relief, as it had during jury selection, finding that no discrimination had occurred. *Commonwealth v. Rico*, Cr. No. 3022-3027, slip op. (Pa. Comm. Pleas Ct. Jul. 29, 1994).

Rico appealed to the Superior Court, again complaining that the prosecutor used his peremptory challenges to strike jurors of Italian descent in violation of *Batson*. The Superior Court agreed as to all but two of the struck jurors, reversed Rico's convictions, and granted him a new trial. *Commonwealth v. Rico*, 662 A.2d 1076 (Pa. Super. Ct. 1995). The Pennsylvania Supreme Court reversed, concluding in an opinion dated April 27, 1998 that the Superior Court erred in rejecting the trial court's factual finding of no purposeful discrimination. The Court remanded for consideration of Rico's prosecutorial misconduct claim which the Superior Court had not found it necessary to decide given its resolution of the *Batson* issue. *Commonwealth v. Rico*, 711 A.2d 990 (Pa. 1998). On remand, the Superior Court affirmed the judgment and sentence, and the Pennsylvania Supreme Court denied Rico's petition for discretionary review on October 14, 1999.

Rico filed this petition under 28 U.S.C. § 2254(d), arguing *Batson* and prosecutorial misconduct. The Magistrate Judge issued a Report and Recommendation, recommending that the petition be dismissed. *Rico v. Leftridge-Byrd*, Civ. No. 00-4841, slip op. (E.D. Pa. Apr. 27, 2001). On November 8, 2001, the District Court adopted the Report and Recommendation, denied Rico's petition, and denied a certificate of appealability. *Rico v. Leftridge-Byrd*, Civ. No. 00-4841, 2001 WL 1428351 (E.D. Pa. Nov. 8, 2001). We certified only Rico's *Batson* claim for appeal. We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253(c)(1), and will affirm.

## II.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214

(codified at, *inter alia*, 28 U.S.C. § 2254), circumscribes a federal habeas court's review of a state court decision. *Lockyer v. Andrade*, 123 S.Ct. 1166 (2003). Under 28 U.S.C. § 2254(d), a federal court must not grant an application for a writ of *habeas corpus* with respect to a state court proceeding unless the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

In order to satisfy § 2254(d)(1), the petitioner must show either that the lower court's decision was "contrary to" Supreme Court precedent or that it was an "unreasonable application of" that precedent. With reference to the "contrary to" prong, a petitioner must show not "merely that his or her interpretation of Supreme Court precedent is more plausible than the state court's [but] that Supreme Court precedent *requires* the contrary outcome." *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 888 (3d Cir. 1999) (*en banc*) (emphasis in original). Satisfaction of the "unreasonable application" prong requires a petitioner to show that "the state court's application of Supreme Court precedent was objectively unreasonable." *Id.* at 889-90. When a federal habeas court is called upon to determine whether a petitioner has made this showing, "mere disagreement with the state court's conclusions is not enough to warrant habeas relief." *Id.* at 890.[2] A state court decision fails the "unreasonable application" prong only "if the court identifies the correct governing rule from the Supreme Court's cases but unreasonably applies it to the facts of the particular case or if the state court either unreasonably extends a legal principle from the Supreme Court's precedent to a new context where it should not apply or unreasonably refuses to extend the principle to a new context where it should apply." *Gattis v. Snyder*, 278

---

2. In *Werts v. Vaughn*, 228 F.3d 178 (3d Cir. 2000), we reaffirmed *Matteo* and held that it was in accord with the intervening Supreme Court decision in *Williams v. Taylor*, 529 U.S. 362 (2000), which construed 28 U.S.C. § 2254(d)(1).

F.3d 222, 234 (3d Cir. 2002)(citing *Williams v. Taylor,* 529 U.S. 362, 407 (2000)).

A state court decision based on a factual determination, such as that required under § 2254(d)(2), will not be overturned on factual grounds unless it was objectively unreasonable in light of the evidence presented in the state proceeding. *Miller-El v. Cockrell,* 123 S.Ct. 1029, 1040-41, 154 L. Ed. 931 (2003). We must presume that the state court's determination of factual issues was correct, and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Campbell v. Vaughn,* 209 F.3d 280, 285 (3d Cir. 2000). A state court's finding of the absence of discriminatory intent is "a pure issue of fact accorded significant deference," which will not be overturned unless clearly erroneous. *Miller-El,* 123 S.Ct. at 1040-41 (citation omitted).

## III.

The Pennsylvania Supreme Court determined that the applicability of *Batson* to an ethnic group depends on whether the group is "a cognizable group that has been or is currently subjected to discriminatory treatment" in the community—a question of fact within the sound discretion of the trial court. *Rico,* 771 A.2d at 994. The Court assumed without deciding that Italian-Americans were a cognizable group subject to the *Batson* rule and, thus, that *Batson* was "triggered," but rejected Rico's *Batson* challenge based on the trial court's finding that the prosecutor's reasons for the strikes were ethnically-neutral and no purposeful discrimination occurred. *Id.* at 996.

We turn first to whether the Pennsylvania Supreme Court's application of the *Batson* rule to Italian-Americans in this jury panel was "contrary to" or "an unreasonable application of" Supreme Court precedent existing at the time. We then must determine whether, if *Batson* could be applied, the trial court — and, as we put it in *Gattis,* "*ipso facto,* the [Pennsylvania] Supreme Court" — failed the "unreasonable determination of the facts" prong of § 2254(d) when it found that the prosecutor did not strike potential jurors from the panel on the basis of their Italian-American status.

**A.** **Was the decision of the Pennsylvania Supreme Court contrary to, or an unreasonable application of, precedent of the Supreme Court of the United States?**

In *Batson*, which involved the criminal trial of a black defendant, the Supreme Court held that in order to establish a *prima facie* case of discrimination in the prosecutor's exercise of peremptory challenges, the defendant must "show that he is a member of a cognizable *racial* group and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's *race.*" *Batson*, 476 U.S. at 80, 96 (emphasis added). In *Hernandez v. New York*, 500 U.S. 352 (1991), the Court applied the *Batson* rule to potential jurors who were bilingual Latinos, with the Court viewing Latinos as a cognizable race for *Batson* purposes and referring to Latinos as both a race and as an ethnicity.[3] In *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994), the Court extended *Batson* to discrimination on the basis of gender. The *J.E.B.* majority explicitly grounded its decision on its conclusion that the Equal Protection Clause bars peremptory challenges based on gender and, it strongly suggested, on any classification otherwise receiving "heightened scrutiny" under the Clause. *See J.E.B.*, 511 U.S. at 135.

In 1998, when the Pennsylvania Supreme Court considered the issue in this case, and *a fortiori* when the trial court even earlier did so, the Supreme Court of the United States had not extended *Batson* to any European-American ethnicity or to national origin — and still has not done so. The state courts, therefore, correctly concluded

---

3. In *Hernandez*, the Supreme Court affirmed the state court's rejection of *Batson* challenges to the exclusion of bilingual Latino potential jurors. The trial court had credited the prosecutor's race-neutral reason for the challenges, which was that these potential jurors would not be able to defer to the official court interpretation of the Spanish-language testimony of the main witnesses because they hesitated when they were asked if they could accept that interpretation. *Hernandez*, 500 U.S. at 357 n.2. The Supreme Court found that the trial court's acceptance of this race-neutral reason and finding of no discriminatory intent was not clearly erroneous.

that whether *Batson* extends to the ethnic classification of Italian-American was a question that had not been addressed by our highest Court. As a result, the state courts' consideration, under *Batson*, of peremptory strikes against Italian-American prospective jurors was not contrary to then-existing precedent of the Supreme Court.

And it certainly was not "objectively unreasonable" for the state courts to have analyzed those strikes under *Batson* and, when they did so, they did not unreasonably apply Supreme Court precedent.[4] Particularly in the years following *Batson* and until at least 1994 when *J.E.B.* was decided, lower federal courts struggled to apply *Batson* and were uncertain whether, and if so, when, *Batson* could be extended beyond race for, of course, it was only race that was before the *Batson* Court. In *United States v. DiPasquale*, 864 F.2d 271 (3d Cir. 1988), our first post-*Batson* foray, we did not answer the question of whether *Batson* applies to Italian-Americans, but made quite clear that even if *Batson* was not limited to black Americans or to race, it must at least be shown — a showing much easier said than done — "that persons with Italian surnames . . . constitute a group that has been singled out for differential treatment *and* has been disparately represented on juries [in the state]." *Id.* at 277 (emphasis in original). The uncertainty continued when, in *Hernandez*, the Court appeared to use "ethnicity" as interchangeable with, or as a proxy for, "race."[5] Indeed, the uncertainty continues to this day with the Court recently stating that under the Equal Protection Clause, "a defendant may not exercise a peremptory challenge to remove a potential juror solely on the basis of the juror's gender, ethnic origin, or race." *United States v. Martinez-Salazar*, 528 U.S. 304, 315 (2000). What, though, does "ethnicity" or "ethnic origin" mean and how does one define the "cognizable racial group"

---

4. In this connection, a state court may consider the decisions of inferior federal courts where those decisions are helpful amplifications of Supreme Court precedent. *Matteo*, 171 F.3d at 890.

5. Justice O'Connor, concurring in *Hernandez*, emphasized, however, that "a peremptory strike will constitute a *Batson* violation only if the prosecutor struck a juror *because of the juror's* race." 500 U.S. at 373 (O'Connor, J. concurring)(emphasis in original).

to which *Batson* itself referred?[6] And how does one define "race" when the understanding of "race" itself has changed over the centuries? *See Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 610-12 (1987).

Most trial courts, it appears, fairly quickly learned to avoid having to determine the extraordinarily difficult question of when and where to draw the line. Rather, most courts simply assumed without deciding that *Batson* has applicability to racial or ethnic groups other than black Americans and then went on to dispose of the *Batson* issue, most often by finding that the prosecutor had (or had not) offered a race-neutral explanation for a strike sufficient to rebut a defendant's *prima facie* case.[7] The state courts did so here, and courts continue to do so. This makes sense, given the reality that, during the process of selecting a jury, there is little or no opportunity to ponder the extremely difficult questions that any extension of *Batson* beyond race or gender would present. In the context of this case, for example, how does one even define "Italian-American"? Is an "Italian-American" one who came from Italy and became a United States citizen? Or is it one who is a first — or second — or third generation "Italian-American"? How much "ethnicity" is enough? What of the woman who has no Italian heritage but bears an Italian name because she

6. *Batson* has been applied by the Supreme Court only to classifications which have heretofore received heightened scrutiny — race, gender, and ethnic origin thus far limited to Latinos. The courts of appeals have also been most restrictive in extending *Batson* beyond these categories. *See, e.g.*, *Brewer v. Marshall*, 119 F.3d 993 (1st Cir. 1997) (using "race" and "ethnicity" interchangeably to describe Latino venire members); *accord United States v. Taylor*, 92 F.3d 1313, 1330 (2d Cir. 1996)(white and black Latinos); *accord United States v. Krout*, 66 F.3d 1420 (5th Cir. 1995)("Hispanic ethnicity"); *see also United States v. Canoy*, 38 F.3d 893, 897-98 (7th Cir. 1994)(applying *Batson* to analyze peremptory strike against venire member of Asian descent, where government did not dispute that defendant, who was Filipino and had spent most of his life in the Philippines, was a member of cognizable racial group).

7. Even given this sidestepping, *Batson* minihearings had become routine in state and federal trial courts, *Batson* appeals had proliferated, and "the number of cases in which jury selection — once a sideshow — will become part of the main event" were increasing. *J.E.B.*, 511 U.S. at 147 (O'Connor, J., concurring).

took the name of her Italian — or "Italian-American" — husband? And, how is one to even begin to know whether a man or woman is "Italian-American" when his or her name is ethnically-neutral or, as in Rico's case, when an ethnically-neutral name has been changed to an Italian name?

Thus, in *DiPasquale*, for example, we did not "consider the correctness of the district court's determination that the rule of *Batson* is not applicable to cognizable racial or ethnic groups other than black Americans under any circumstances" because we found no reversible error in the District Court's decision not to order a *Batson* hearing given that the defendant had failed to establish a *prima facie* case of discrimination. *Id.* at 276. Other courts of appeals, in the years immediately following *Batson*, similarly declined to extend *Batson*'s protections to white ethnic groups absent evidence that the group had been discriminated against. *See, e.g., Murchu v. United States*, 926 F.2d 50 (1st Cir. 1991)(per curiam)(refusing to expand *Batson* protections to Irish-Americans, absent any allegation or evidence that they needed protection from community prejudices); *United States v. Campione*, 942 F.2d 429 (7th Cir. 1991)(holding that trial court did not err in finding that defendant had not stated *prima facie* claim under *Batson* absent evidence that Italian-Americans were a cognizable group subject to discrimination). *Batson* issues in these types of cases almost invariably failed because of the lack of such evidence.

It was, therefore, not objectively unreasonable for the state courts to consider challenges to Italian American prospective jurors under *Batson* and, when they did so, they did not unreasonably apply Supreme Court precedent. We, thus, proceed to analyze the basis for the state courts' decisions: the finding that no discrimination occurred in the prosecutor's use of peremptory challenges assuming, as did they, that *Batson* applied.

### B. Did the state courts unreasonably determine the facts?

Rico contends that the prosecutor exercised seven of his twenty peremptory challenges against Italian-American

prospective jurors, in violation of the Equal Protection Clause. The trial court determined that the prosecutor had not exercised any of his strikes solely on the basis of the prospective jurors' Italian-American heritage, and the Pennsylvania Supreme Court agreed.

We evaluate a claim under *Batson* using a three-step process: (1) has the objector established a *prima facie* case of purposeful discrimination in the exercise of peremptory challenges against jurors of, for example, a particular race?; (2) if yes, did the party defending the challenges rebut the *prima facie* case by tendering a race-neutral explanation for the strikes?; (3) if so, has the objector carried his or her burden of proving purposeful discrimination, such as showing that the proffered explanation is pretextual. *United States v. Milan*, 304 F.3d 273, 281 (3d Cir. 2002). One way to establish a *prima facie* case at step one is to show a pattern of peremptory challenges of jurors of a particular race. *Batson*, 476 U.S. at 96-97. At step two of this process, the issue is whether the prosecutor's explanations are race-neutral. *Purkett v. Elem*, 514 U.S. 765, 768 (1995)(per curiam). At step three, "the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Miller-El v. Cockrell*, 123 S.Ct. 1029, 1040, 154 L. Ed. 931 (2003).

With respect to the first of the seven potential jurors named by Rico, Cathy Roba, Rico did not object to the prosecutor's strike and did not even suggest that she was Italian-American. With respect to the second and third, Enrico Salvatore and Linda Giordano, Rico pointed to nothing except the mere fact of the surnames they bore. We have not permitted a defendant to base a *Batson* challenge solely on the fact that a potential juror has an Italian surname. *DiPasquale*, 864 F.2d at 277. The rejection of Rico's *Batson* claim with regard to the strikes of Roba, Salvatore and Giordano, therefore, was certainly not "objectively unreasonable."

With respect to the strikes of prospective jurors Mary Tucci and John Taconelli, the trial court accepted as genuine the prosecutor's stated race-neutral reasons, and did not err in so doing. Tucci, it was feared, would not comprehend the facts of the case and Taconelli, who was an unmarried, male, former professional housekeeper, and who demurred when asked if he could be fair and impartial, seemed "rather odd" and "very, very, strange."

More problematic were the strikes of Vincent Georgi and Susan Bratrolla, and problematic only because the trial court had by then observed that the prosecutor had struck several prospective jurors with what appeared to be Italian surnames. When Rico objected to the strike of Georgi, the prosecutor explained that when he asked Georgi whether organized crime would affect his ability to be fair, Georgi "turned red" and seemed uncertain, and there was fear in his voice and demeanor. The prosecutor added that these factors "in conjunction with his Italian background led me to believe he would not be a juror suitable with this case." Thus, the prosecutor concluded from multiple factors that Georgi feared the "mob," and conceded that the fact that Georgi was Italian-American helped him reach this conclusion. The Commonwealth argues, however, that *Batson* does not prohibit *any* consideration of a potential juror's race or ethnicity; rather, it prohibits excluding potential jurors based *solely* on a forbidden category.

The Supreme Court has not yet addressed mixed motives in jury selection. Accordingly, a state court's application of mixed motives analysis in the *Batson* context would be reviewed under the "unreasonable application" prong of § 2254(d)(1). In considering a § 2254 petition in *Gattis*, we found that the state court did not act unreasonably in applying mixed motive analysis in the *Batson* context, in light of the Supreme Court's decisions in *J.E.B.* and *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977).[8] *Gattis*, 278 F.3d at 234. The reasoning of *Gattis* applies equally here.

---

8. In *Gattis*, we considered a habeas petition based partly on a *Batson* challenge in a mixed motives case. The prosecutor had offered two reasons for his strike of an older man from the jury: the man's

Under mixed motives analysis, an action partially motivated by an improper purpose is nonetheless valid if the alleged offender would have taken the same action in the absence of the improper motive. *See Mt. Healthy*, 429 U.S. at 287. Although the trial court did not explicitly find that Georgi's Italian-American ethnicity was a *de minimis* motivation for the prosecutor, it accepted as genuine the prosecutor's stated motive for striking Georgi: he seemed afraid of the "mob." A prosecutor's perception that a juror fears the "mob" is a permissible reason to exercise a peremptory challenge. Moreover, the prosecutor did not attempt to strike all prospective jurors with Italian surnames from the jury: the prosecutor did not object to Peter DeAngelis, who became a juror; to Jane Cola, against whom the defense exercised a peremptory challenge; or to Joanne Dinamoli, who became an alternate juror. On these facts, the trial court did not clearly err in finding that the fact that Georgi was Italian-American — however "Italian-American" is defined — was a *de minimis* motivation in the exercise of the strike against him, and the court's rejection of Rico's *Batson* claim with respect to Georgi was not objectively unreasonable.

When Rico objected to the prosecutor's strike of Susan Bratrolla, the prosecutor offered the following explanation: Bratrolla was potentially subject to intimidation because her home in South Philadelphia in, as she herself called it, "the mob area," was very close to the crime scene. The trial court expressed some concerns about what was beginning to appear to be a pattern of striking prospective jurors with Italian names and only permitted the strike when the prosecutor pointed out that the Commonwealth would be

---

uncertainty as to whether he could recommend the death penalty and the fact that there were "four or five older gentlemen" already on the jury. *Gattis*, 278 F.3d at 232. The state court was satisfied that the prosecutor would have challenged the juror even absent a gender-related reason, and that the gender-based motivation was *de minimis*. *Id.* at 233. We rejected the *Batson* claim, finding that the petitioner had not clearly and convincingly rebutted the court's factual conclusions, and finding that the state court had not unreasonably applied mixed motive analysis in the *Batson* context. *Id.* at 235.

prejudiced by the fact that he had exercised the strike in front of Bratrolla. In its opinion denying Rico's post-trial motions, however, the trial court explained that after a careful review of the record, it believed that the prosecutor's explanation was ethnically-neutral. *Rico*, Cr. No. 3022-3027, slip op. at 12-13. The trial court evidently credited the Commonwealth's ethnically-neutral explanation as genuine given that it overruled Rico's objection to the strike.

Rico contends, however, that there was evidence of pretext which was ignored: the prosecutor did not strike potential juror Ernesta Thomas, a non-Italian-American who also resided in South Philadelphia. But, as was pointed out, Thomas lived further away from the crime area than did Bratrolla. Moreover, the prosecutor acted consistent with his proffered race-neutral explanation when he struck a juror named Eugene Oprocca, of Polish descent, because he lived "pretty close" to where the crime had been committed and remembered hearing that someone had been found dead in a car. Finally, the three prospective jurors or alternate jurors with Italian surnames whom the prosecutor did not strike—DeAngelis, Cola, and Dinamoli—did not live in the same neighborhood. It was not clearly erroneous to find that the prosecutor's strike of Bratrolla was motivated by "ethnically-neutral" reasons, and the state courts did not act unreasonably in rejecting his *Batson* challenge with respect to her.

## IV.

Because the Pennsylvania Supreme Court's rejection of Rico's *Batson* claim was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, and because it was not based on an unreasonable determination of the facts, the District Court's decision denying Rico's petition for a writ of *habeas corpus* will be affirmed.

14

A True Copy:
    Teste:

*Clerk of the United States Court of Appeals
for the Third Circuit*