

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-17-2003

# USA v. DeJesus

Precedential or Non-Precedential: Precedential

Docket No. 02-1394

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"USA v. DeJesus" (2003). *2003 Decisions.* Paper 162.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/162

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed October 17, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 02-1394

———————

UNITED STATES OF AMERICA

v.

JERRY DEJESUS,

Appellant

———————

On Appeal from the United States District Court
for the District of New Jersey

District Court Judge: Honorable Jerome B. Simandle
(D.C. No. 99-cr-00728)

———————

Argued on December 13, 2002

Before: FUENTES, STAPLETON, *Circuit Judges*, and
O'KELLEY,* *District Judge.*

(Opinion Filed: October 17, 2003)

———————

George S. Leone
Office of United States Attorney
970 Broad Street, Room 700
Newark, New Jersey 07102

———————

* Hon. William C. O'Kelley, United States District Judge for the Northern
District of Georgia, sitting by designation.

Glenn J. Moramarco [Argued]
Office of United States Attorney
Camden Federal Building &
 Courthouse
401 Market Street
P.O. Box 2098, 4th Floor
Camden, New Jersey 08101

*Attorneys for Appellee*

Lisa C. Evans [Argued]
Office of Federal Public Defender
800 Cooper Street, Suite 350
Camden, New Jersey 08102

*Attorney for Appellant*

---

## OPINION OF THE COURT

---

FUENTES, *Circuit Judge*:

The primary issue in this appeal is whether the government violated the Equal Protection Clause when it peremptorily struck two African American, presumably Christian, jurors from the venire. The District Court held that race was not a factor in the strikes and that the government's religion-related reasons for the strikes were permissible. Because we are satisfied that the government's peremptory strikes in this case were based on the jurors' heightened religious involvement rather than a specific religious affiliation, and because they were not racially motivated, we will affirm.

## I.  Background

Following a report of a stolen car and a high-speed pursuit, Jerry DeJesus was stopped, arrested, and found to be carrying a firearm and two magazine clips in his jacket pocket. Due to a prior felony conviction, DeJesus was charged with the illegal possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). DeJesus' first trial ended in a mistrial after the jury was unable to reach a verdict. After a three-day retrial, the jury

found him guilty. Thereafter, DeJesus was sentenced to a prison term of 110 months, three years of supervised release, and a special assessment of $100. DeJesus filed a timely notice of appeal. In addition to DeJesus' jury selection claim, he appeals his sentence. We will set forth only the facts that relate to these two issues.

## A. Jury Selection

Jury selection for DeJesus' retrial was conducted in three phases. First, the prospective jurors were asked to complete a questionnaire. Second, the District Court conducted individual voir dire of prospective jurors. Third, the government and the defense had an opportunity to exercise their statutorily-allotted peremptory strikes.

During the selection process, prospective juror Ronald McBride revealed that a cousin to whom he had been close had been murdered, but that he had learned to forgive the murderer. (App. at 126). On the juror questionnaire McBride stated that: (a) his hobbies involve civic activities with his church; (b) he reads the Christian Book Dispatcher; (c) he holds several biblical degrees; (d) he is a deacon and Sunday School teacher in the local church; and, (e) he sings in a couple of church choirs. *Id.* at 93, 127. Prospective juror James Bates revealed that: (a) he is an officer and trustee in his church; (b) he reads the Bible and related literature; and, (c) his hobbies are church activities. *Id.* at 91, 130.

The government peremptorily struck Bates and McBride. As a result, defense counsel posed a *Batson* challenge.[2] Defense counsel asserted that the only thing Bates and McBride had in common was that they were both African American. She also pointed out that there was only one other African American juror remaining in the jury pool.[3]

2. A *Batson* challenge refers to the procedure by which a party contests the exercise of a peremptory strike thought to be exercised in violation of the Equal Protection Clause. *See Batson v. Kentucky*, 467 U.S. 79, 89 (1986); *Hernandez v. New York*, 500 U.S. 352, 358-59 (1991).

3. The District Court corrected the record in its January 24, 2002 opinion by stating that there was a fourth African American man present in the jury pool who had not yet been called. (App. at 14).

The District Court asked the government to state the reasons for the strikes.

In response, the government explained that the strike against McBride was based on the juror's high degree of religious involvement and his ability to forgive his cousin's murderer, both of which might make him reluctant to convict. *Id.* at 128-29. In regard to the strike against Bates, the government explained that when Bates was brought "from the jury pool up into the box and throughout the duration," the juror "looked the government's way and then turned his eyes away several times." *Id.* at 130. According to the government, Bates' unwillingness to make eye contact demonstrated a possible anti-government prejudice. The government also explained that Bates' "fairly strong religious beliefs" might prevent him from rendering judgment against another human being. *Id.*

The District Court asked the government if it was "undervaluing" the fact that Bates and McBride "answered questions to the effect that they would follow the law and that they would consider only the evidence in this case." *Id.* at 130. The government responded, "No, your Honor, I don't think we are. . . . [T]he government submits that the answers about the strong [religious] beliefs outweigh, in this case, their ability to be fair and impartial jurors." *Id.* at 131.

Defense counsel responded that peremptory strikes based on religion would be just as improper as those based on race, and urged the District Court to grant the *Batson* challenge on that ground as well. *Id.* at 128. Counsel continued to argue, though, that the government's stated reasons were a pretext for racial discrimination. *Id.* at 131-32. As proof, defense counsel pointed to the fact that the same two government attorneys did not strike Jacquelin Wood as a juror in DeJesus' first trial. *Id.* at 131. Wood was a minister who had several degrees in different religious studies. *Id.* In response, the government stated that "Ms. Wood did have some religious convictions. . . . She was not stricken. But, again, we believe we've learned from the experience. Why we're all here today on a retrial, it may very well have been, your Honor, some type of religious

belief that infected or paraded into the jury's province in the first trial." *Id.* at 133.

The District Court accepted the government's stated reasons for the peremptory strikes against jurors Bates and McBride, and denied defense counsel's *Batson* challenge. *Id.* at 134. The District Court explained its understanding that the defendant's challenge was not "a challenge based on some denomination of religion, but it is a challenge based upon how the jurors chose to spend their time, reading the bible." *Id.* at 135.

Thereafter, the government used another peremptory strike to remove prospective juror George B. Pressey, a Caucasian man, from the jury pool. *Id.* at 146. This juror listed his interests as being active in his church, including serving on the board of trustees, heading up the building of a new sanctuary, and being in charge of the ushering department. *Id.* at 144-45. The government was not called upon to explain its reasons for striking Pressey.

The final jury, including one alternate, was comprised of three African Americans, nine Caucasians, and one Hispanic. There were six men and seven women. The government had three of its six peremptory strikes remaining, and the defense had three of its ten strikes remaining. *Id.* at 17 n.2.

The next day, defense counsel moved for a mistrial on the basis of the *Batson* objections. *Id.* at 247. Counsel argued that the government's peremptory strikes against Bates and McBride were impermissibly motivated by either the race or the religious affiliation of the jurors. *Id.* at 243-45. Counsel also belatedly objected to the peremptory strike of Pressey, a Caucasian man, because that strike, too, was motivated by his religious affiliation. *Id.* at 245. According to defense counsel, the religious denominations of Bates, McBride, and Pressey were clearly Christian because "they stated that they studied and read the Bible." *Id.* at 244. In response, the government stated that it had "no idea" as to the specific religious affiliation of the stricken jurors because that was not developed during voir dire. *Id.* at 247. The District Court provisionally denied the mistrial application and allowed the trial to go forward, pending additional research on the issue. *Id.* at 249.

### B. District Court Opinion

On January 24, 2002, the District Court issued an opinion denying DeJesus' mistrial application. The District Court held that "while *Batson* may extend to protect against striking a potential juror based upon the juror's membership in a particular religious denomination having no relevance to the issues in the case, none of these jurors were struck by the government upon an impermissible ground." *Id.* at 13.

### C. Sentencing

During the sentencing proceeding on January 25, 2002, defense counsel objected to the four-level upward adjustment recommended by the Probation Department under United States Sentencing Guidelines § 2K2.1(b)(5). The District Court identified the issue as "whether the defendant possessed a firearm in connection with another felony offense of car theft and receiving stolen property." *Id.* at 262. Defense counsel argued that the government had failed to meet its burden of proving that there was a connection between DeJesus' possession of a firearm and his commission of another felony offense. In fact, counsel asserted that "the firearm played no role in the actual car theft. He did not use the gun in any manner to facilitate the car theft." *Id.* The government argued that the fact that DeJesus did not actually display the gun during the car theft is of no moment under the case law; the mere fact that he had a firearm in his possession emboldened him to steal the car. *Id.* at 265.

The District Court found that DeJesus had a firearm in his right jacket pocket when he was arrested, which was within 10 to 15 minutes of the car theft. The District Court, concluding that it is reasonable to infer that the purpose of possessing a handgun during a robbery is to facilitate the offense, stated as follows:

> [T]he unloaded .380 semi-automatic, chrome with black handle, presents an intimidating sight, whether loaded or unloaded. . . . It is a reasonable inference that DeJesus would readily use it for intimidation purposes if someone questioned or tried to intervene in

his car thievery and escape. . . . The crime of car theft is a crime for which it's logical that the defendant's possession of the firearm was in furtherance of his attempts to successfully steal the vehicle. He was stealing the vehicle from a residential street. It was not unlikely that he would encounter someone during the course of stealing the car. His mindset at the time was extremely adverse to being apprehended, perhaps through recognition of his own prior criminal record.

*Id.* at 272-73. Accordingly, the District Court ruled that the government had met its burden of proving the connection between the firearm possession and the car theft for the purpose of imposing the four-level upward adjustment under U.S.S.G. § 2K2.1(b)(5), and overruled defense counsel's objection. *Id.* at 273, 275.

## II.  Jurisdiction and Standard of Review

The District Court had jurisdiction over this criminal matter pursuant to 18 U.S.C. § 3231. We have appellate jurisdiction to review the final judgment and sentence pursuant to 28 U.S.C. § 1291 and 18 U.S.C. §§ 3742(a)(1), (2).

We review the District Court's factual determination of whether discriminatory intent motivated the government's peremptory strikes for clear error. *See United States v. Uwaezhoke*, 995 F.2d 388, 394 (3d Cir. 1993), *cert. denied*, 510 U.S. 1091 (1994). Our review of the District Court's interpretation and application of the Sentencing Guidelines is plenary, *United States v. Johnson*, 155 F.3d 682, 683 (3d Cir. 1998), but we review the District Court's factual findings at sentencing for clear error. *United States v. Loney*, 219 F.3d 281, 288 (3d Cir. 2000).

## III.  Analysis

DeJesus raises two issues on appeal. First, he argues that the government peremptorily struck prospective jurors Bates and McBride in violation of the Equal Protection Clause because the strikes were impermissibly based on the jurors' race or religious affiliation.[4] Second, he argues

_____

4. DeJesus is not challenging the government's strike against Pressey on appeal because "religious affiliation was not the primary reason for that

that there was insufficient evidence to support the District Court's conclusion that DeJesus' possession of a firearm facilitated his theft of a car, thus warranting the application of the four-level sentence enhancement in Sentencing Guideline 2K2.1(b)(5).

## A.  Challenges to the Government's Peremptory Strikes

DeJesus presses two different challenges to the government's peremptory strikes against Bates and McBride. He argues that the government's stated reasons were a pretext for racial discrimination, which the Supreme Court determined in *Batson v. Kentucky*, 476 U.S. 79 (1986), violates the Equal Protection Clause. He also argues that *Batson* extends to peremptory strikes based on religious affiliation and that the government impermissibly struck Bates and McBride on the basis of their Christian affiliation.

We pause initially to consider generally the role of peremptory challenges. Peremptory challenges are a part of our common law heritage and play a crucial part in empaneling fair and impartial juries. The decision to exercise a peremptory strike need not be supported by any reason. It is usually based on educated guesses about probabilities based on the limited information available to an attorney about prospective jurors. The challenge is intended for those situations in which an attorney cannot articulate a specific conflict, but has some reason to believe a juror may be less desirable than other jurors who may be called. *See Uwaezhoke*, 995 F.2d at 394 n.5. Nonetheless, the Supreme Court established in *Batson* that in order to maintain the "dignity of persons" and the "integrity of the courts," the Equal Protection Clause must prevent prosecutors from using peremptory strikes to remove jurors on the basis of race. *Powers v. Ohio*, 499 U.S. 400, 402 (1991). The Supreme Court extended that logic to peremptory strikes based on gender in *J.E.B. v. Alabama ex*

strike and the defendant did not object to the strike at the time it was exercised." (DeJesus' Opening Brief at 31 n.6).

*rel. T.B.*, 511 U.S. 127 (1994). But it remains the rule that peremptory strikes are presumptively valid until it is shown that they were exercised on an unconstitutional basis, such as race or gender, and they continue to serve an important role in empaneling fair and impartial juries. Against this background, we consider defendant's race and religion-based challenges.

### 1.   Race-based Challenge

In *Batson*, the Supreme Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race . . ." 476 U.S. at 89. In *Hernandez v. New York*, the Court summarized the process to be followed in a criminal case when defense counsel challenges the government's peremptory challenge:

> In *Batson*, we outlined a three-step process for evaluating claims that a prosecutor has used peremptory challenges in a manner violating the Equal Protection Clause. . . . First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.

500 U.S. 352, 358-59 (1991) (citations omitted).

In order to make a prime facie showing, the defendant must show that the government has exercised peremptory challenges to remove members of a particular race from the venire.[5] *Batson*, 476 U.S. at 96. When, as in this case, the

---

5. We note that DeJesus, a Hispanic man, is challenging the strikes of two African American jurors on the basis of their race. The racial difference between DeJesus and the stricken jurors is irrelevant for the purpose of posing a *Batson* challenge. *See Powers*, 499 U.S. at 416 (holding that "race is irrelevant to a defendant's standing to object to the discriminatory use of peremptory challenges").

government offers an explanation for its peremptory strikes before the district court has addressed the adequacy of the prima facie showing, "any issue regarding the existence of a prima facie showing of discrimination becomes moot . . . ." *Uwaezhoke*, 995 F.2d at 392; *see also Hernandez*, 500 U.S. at 359. Accordingly, we will turn to the second prong of the *Batson* analysis.

At the second prong of the *Batson* analysis, we examine the government's explanation to determine if it was facially race-neutral. The second step "does not demand an explanation that is persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 768 (1995). "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez*, 500 U.S. at 360.

With respect to McBride, the government explained that the strike was based on the juror's ability to forgive his cousin's killer and a suspicion that the juror's strong religious beliefs would prevent him from rendering judgment against another human being. (App. at 126). The government added that McBride had indicated on the juror questionnaire that he reads the Christian Book Dispatcher, holds several biblical degrees, and is a deacon in the local church, and that these factors tend to indicate that McBride would "hesitate to pass judgment on someone." *Id.* at 127. With respect to Bates, the government noted that when the juror was brought "from the jury pool up into the box and throughout the duration," the juror "looked the government's way and then turned his eyes away several times." *Id.* at 130. In addition to its worry about a possible anti-government prejudice, the government was concerned that Bates' "fairly strong religious beliefs," might prevent him from rendering judgment against another human being. *Id.* As evidence of Bates' strong religious beliefs, the government cited Bates' statements that he only reads the bible and holds an office in the church. *Id.*

The District Court found the government's race-neutral explanations to be facially valid. We agree with that finding, and, in any event, DeJesus does not challenge it on appeal. Instead, he argues that the government's explanations were

pretextual, and that the District Court's finding as to the third prong of the *Batson* analysis was clearly erroneous.

With respect to the third prong, the District Court found that "the mix of reasons articulated by the prosecution team, and confirmed in several instances by counsel's contemporaneous notes of the jurors' characteristics, represent the true and sincere reasons. The defendant thus has not demonstrated that the government has engaged in purposeful discrimination on racial . . . grounds in excluding these jurors." (App. at 35).

Whether the government has engaged in impermissible discrimination during jury selection is a matter that is uniquely within the province of the trial judge. As the Supreme Court has noted, "[i]n the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.' " *Hernandez*, 500 U.S. at 365 (quoting *Wainwright v. Witt*, 469 U.S. 412, 428 (1985)); *see also Batson*, 476 U.S. at 98 n.21. "We must accept the factual determination of the district court unless that determination 'either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data.' " *Uwaezhoke*, 995 F.2d at 394 (quoting *Haines v. Liggett Group, Inc.*, 975 F.2d 81, 92 (3d Cir. 1992)).

The government's observation that Bates and McBride were highly involved in religious activities is supported by the record. In responding to the juror questionnaire, Bates said that he reads "a lot of bible literature, and the bible," and that his hobbies "are church activities, and [he is] an officer of the church and trustee." (App. at 91). Similarly, McBride said that he reads "the Press and magazines, the CBD Christian Book Distributor," he has "several . . . biblical degrees," and his hobbies are civic and church-related, including serving as a deacon, Sunday school

teacher, and member of the choir. *Id.* at 92-93. The government's observation that McBride had forgiven his cousin's killer is based on the following exchange:

> The Court: Is there anything about [the shooting of your cousin], and how it affects you, that makes it difficult for you to be a juror in this case?

> Juror #5: Ten years ago, yes. But today, no, because I've learned to forgive.

*Id.* at 96. The government's observation that Bates "looked the government's way and then turned his eyes away several times" was included in the government's voir dire notes. *Id.* at 130.

Not only are the government's reasons supported by the record, but they also bear a "hue of credibility." *Uwaezhoke,* 995 F.2d at 394. The government used peremptory strikes to remove Bates, McBride, and Pressey from the jury. The common thread among these strikes was the government's concern that the religious beliefs of the jurors as reflected by their reading choices, hobbies, statements, and demeanor in court would tend to make them unable or unwilling to pass judgment on another human being. The government's concern stemmed in part from the fact that it did not strike juror Wood, who had strong religious convictions, during the voir dire for DeJesus' first trial. (App. at 132-33). The first trial resulted in a hung jury and a mistrial, and the government speculated that "it may very well have been . . . some type of religious belief that infected or paraded into the jury's province in the first trial." *Id.* at 133. The government stated that it had "learned from the experience." *Id.* The government's stated concern about strong religious beliefs during voir dire for the second trial is credible given its suspicion regarding juror Wood's religious views having caused the mistrial. Accordingly, there is no reason to disturb the District Court's credibility determination. *Hernandez,* 500 U.S. at 365 ("As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.' ").

Nonetheless, DeJesus argues that "the reasons offered by the government for the strikes . . . were completely

irrelevant to the stricken jurors' ability to perform as jurors in a particular case." (DeJesus' Reply Brief at 1). This argument is not persuasive. *Batson* requires the party opposing a challenge to articulate a non-pretextual, race-neutral reason for exercising the strike. However, *Batson* does not require the party to show that the reason articulated is relevant to a juror's suitability. In fact, peremptory strikes are available, in large part, because ". . . it is not feasible for lawyers to know much about individual jurors. Counsel must rely on educated guesses about probabilities based on their limited knowledge of a particular juror and their own life experiences." *Uwaezhoke*, 995 F.2d at 394 n.5.

DeJesus also raises a disparate impact argument with respect to the government's reasons for striking Bates and McBride. He asserts that "[i]t is also clear that strong affinity to the Bible or bible studies is a characteristic identified with large segments of the African-American population. Consequently, peremptory strikes predicated upon nothing more than Bible-based Christian religious orientation, with no evidence of an effect on juror impartiality or ability, inevitably results in over-application to African-Americans. In short, the reason expressed, if applied uniformly, is a proxy for race which leads to the inescapable conclusion that the strikes of Bates and McBride were motivated by race." (DeJesus' Opening Brief at 26-27).

The first problem with DeJesus' disparate impact argument is that it was not raised during voir dire. Where, as here, the defendant did not rely "upon the alleged disparate impact of a tendered explanation, the trial judge [had no] duty to stop in the middle of the *voir dire* and consider whether the tendered explanation may have [had] such an impact." *Uwaezhoke*, 995 F.2d at 393 n.4. The second problem with the disparate impact argument is that there is no evidentiary support for it in the record. Even assuming DeJesus is correct that "strong affinity to the Bible or bible studies is a characteristic identified with large segments of the African-American population," there is nothing in the record to indicate that the government was aware of this correlation or had any intent to act on the

basis of such a correlation. Without proof to that effect, there is simply no merit to DeJesus' *post hoc* disparate impact argument. *See Hernandez*, 500 U.S. at 359-60 (quoting *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264-65 (1977)) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.' "); *J.E.B.*, 511 U.S. at 143 (holding that "[e]ven strikes based on characteristics that are disproportionately associated with one gender could be appropriate absent a showing of pretext").

The government's decision to strike Pressey and the final composition of the jury also negate DeJesus' argument. Pressey, like Bates and McBride, listed religious activities and reading materials on his juror questionnaire. As it did with respect to Bates and McBride, the government used a peremptory strike to remove Pressey from the jury. Unlike Bates and McBride, however, Pressey was Caucasian. The use of a strike to remove Pressey gives credence to the government's race-neutral explanation for striking Bates and McBride. Another factor that makes the government's race-neutral explanation more believable is that one Hispanic and three African Americans were seated in the final jury, and the government had three peremptory strikes remaining.[6]

In sum, the District Court did not clearly err in concluding that the government's explanations for striking Bates and McBride were not a pretext for racial discrimination.

## 2. Religion-based Challenge

In addressing the *Batson* challenge, the District Court assumed that "the categorical striking of a juror based

6. DeJesus argues that the government struck Pressey only in order to lend credibility to its earlier-stated reasons for striking Bates and McBride. DeJesus argues in a similar vein that the government did not strike the remaining minority jurors in order to avoid an appearance of racial prejudice since it had already used its first two strikes against African Americans. These points were not pressed in the trial court and, in any case, we find them to be without merit.

upon denomination affiliation . . . would be constitutionally offensive to the guarantee of free religious affiliation." (App. at 29). The District Court found, however, that "[t]he reasons stated by the government in this case point to the prosecution's concerns about inclinations of these potential jurors manifested by their unusual degree of involvement in church activities and religious readings, but not directly associated with a specific religion, that may affect the jurors' judgment of others." *Id.* at 33.

DeJesus argues that the District Court correctly assumed that a strike based on a juror's religious affiliation would be unconstitutional.[7] DeJesus maintains that the stricken

---

7. Neither the Supreme Court nor this Court has ruled on this issue. *See Davis v. Minnesota*, 511 U.S. 1115 (1994) (denying certiorari to appeal from Minnesota Supreme Court decision declining to extend *Batson* to religion); *United States v. Clemmons*, 892 F.2d 1153, 1158 n. 6 (3d Cir. 1990) (declining to consider claim of religious discrimination in exercise of peremptory strike because issue raised for the first time on appeal).

There is no clear consensus among the other Circuits on this issue. *See e.g. United States v. Stafford*, 136 F.3d 1109, 1114 (7th Cir. 1998) (stating in dicta that "[i]t would be improper and perhaps unconstitutional to strike a juror on the basis of his being a Catholic, a Jew, a Muslim, etc.", but holding that because "status of peremptory challenges based on religion is unsettled," allowing strike based on religion was not plain error); *United States v. Berger*, 224 F.3d 107, 120 (2d Cir. 2000) (declining to decide whether *Batson* extends to strikes based on religious affiliation because prosecutor provided a reason for the strike based on something other than juror's membership in a protected class).

The state courts are not uniform in their approach to this issue either. *Compare State v. Fuller*, 356 N.J. Super. 266, 279, 812 A.2d 389, 397 (N.J. App. Div. 2002) (finding that exclusion of jurors based on religious affiliation would violate the state constitution's Equal Protection Clause); *State v. Purcell*, 199 Ariz. 319, 326, 18 P.3d 113, 120 (Ct. App. Ariz. 2001) (holding that *Batson* encompasses peremptory strikes based upon religious affiliation or membership); *Thorson v. State*, 721 So.2d 590, 594 (Miss. 1998) (holding that state constitutional and statutory law prohibit the exercise of peremptory challenges based solely on a person's religion); *with Casarez v. State*, 913 S.W.2d 468, 496 (Ct. Crim. App. Texas 1994) (en banc) (holding that "interests served by the system of peremptory challenges in Texas are sufficiently great to justify State implementation of choices made by litigants to exclude persons from service on juries . . . on the basis of their religious affiliation."); *State v. Davis*, 504 N.W.2d 767, 771 (Minn. 1993) (declining to extend *Batson* to strikes on the basis of religious affiliation).

jurors' religious affiliations were made apparent by their responses to the questionnaires, in which they mentioned "key symbols of Christianity" such as the bible and bible literature, Sunday school, and the church choir. (DeJesus' Opening Brief at 32). In response, the government insists that neither the Court nor the lawyers were aware of the religious affiliations of Bates or McBride during voir dire. (Government's Brief at 39-40). The government argues that the strikes were based only on the jurors' beliefs and that strikes based on beliefs, even if religiously-inspired, are permissible. *Id.* at 40-41 n.15. The government also directs our attention to *Rico v. Leftridge-Byrd*, 340 F.3d 178, 183 (3d Circ. 2003), for the proposition that *Batson* protection should not be extended to a group unless the group had been singled out for disparate treatment in the past and had been disparately represented on juries.

Because we affirm the District Court's finding that the government's strikes were based on the jurors' heightened religious involvement rather than their religious affiliation, we need not reach the issue of whether a peremptory strike based solely on religious affiliation would be unconstitutional. Bates and McBride did not state their religious affiliations during voir dire. Of course, it is certainly fair to infer, as DeJesus has done on appeal, that the jurors are Christian based on their questionnaire responses. But the government did not refer to the religious affiliation of either juror in articulating its reasons for striking Bates and McBride. Instead, the government said that their unusual amount of religious activity suggested strong religious beliefs, which could prevent them from convicting the defendant. The District Court agreed, stating that: "faced with a prospective juror whose answers to neutral questions regarding hobbies, pastimes, reading materials, television programs and the like reveal a rather consuming propensity to experience the world through a prism of religious beliefs, it is rational for a prosecutor to act upon the concern about the reluctance to convict." (App. at 30-31).

Even assuming that the exercise of a peremptory strike on the basis of religious affiliation is unconstitutional, the exercise of a strike based on religious beliefs is not.

Addressing the precise issue presented in this case, the Seventh Circuit held that "[i]t is necessary to distinguish among religious affiliation, a religion's general tenets, and a specific religious belief. . . . . It would be proper to strike [a juror] on the basis of a belief that would prevent him from basing his decision on the evidence and instructions, even if the belief had a religious backing . . . ." *Stafford*, 136 F.3d at 1114. Several state courts have made a similar distinction between strikes based on beliefs and membership in a protected class. *See, e.g., Fuller*, 356 N.J. Super. at 2279-80, 812 A.2d at 397 (finding permissible a peremptory strike based on prosecutor's inference from juror's traditional Muslim clothing that juror was religiously devout and therefore likely to be defense-oriented); *Purcell*, 199 Ariz. at 328, 18 P.3d at 122 (holding strike constitutional because it was based on juror's personal beliefs rather than religious affiliation); *Card v. United States*, 776 A.2d 581, 594-95 (D.C. Ct. App. 2001) (finding strike based upon inferred allegiance to Louis Farrakhan related to a "genuine race-neutral concern regarding the potential juror's desire to hamstring any possible conviction.").

The distinction drawn by the District Court between a strike motivated by religious beliefs and one motivated by religious affiliation is valid and proper. The District Court's finding that the government struck jurors Bates and McBride out of concern that their heightened religiosity would render them unable or unwilling to convict was not erroneous.

### 3. Dual Motivation Analysis

DeJesus argues that the District Court erred by failing to apply the dual motivation analysis to his *Batson* claim. Because DeJesus did not raise this issue below, we consider this argument under the plain error standard of review. *United States v. Olano*, 507 U.S. 725, 732 (1993).

In *Gattis v. Snyder*, we held that dual motivation analysis is appropriate in addressing a *Batson* challenge when the prosecutor offers both discriminatory and non-discriminatory explanations for the strike. 278 F.3d 222,

234-35 (3d Cir. 2002). Here, the government offered two reasons for striking Bates — his body language and heightened religiosity — and two reasons for striking McBride — his willingness to forgive and heightened religiosity. As we explained in the previous two sections of this opinion, we conclude that the District Court did not err in finding each of the government's reasons to be non-discriminatory. Therefore, the District Court did not err in failing to *sua sponte* conduct a dual motivation analysis.

## B. Sentencing Issue

The United States Sentencing Guidelines require a four-level adjustment when "the defendant used or possessed any firearm or ammunition in connection with another felony offense. . . ." U.S.S.G. § 2K2.1(b)(5). DeJesus does not dispute the fact that he possessed a firearm or that his theft of Gorge Rivera's car constituted "another felony offense." DeJesus disputes only the District Court's finding that he possessed the firearm "in connection with" the car theft.

This Court has clarified the scope of the "in connection with" element of U.S.S.G. § 2K2.1(b)(5). In *United States v. Loney*, we concluded that "we should construe § 2K2.1(b)(5) as covering a wide range of relationships between the firearm possession and the other felony offense." 219 F.3d 281, 284 (3d Cir. 2000). We explained that the broad construction of "in connection with" was necessary because:

> [The] definitions suggest that the phrase "in connection with" expresses some relationship or association, one that can be satisfied in a number of ways such as a causal or logical relation or other type of relationship. We do not attempt to provide an exhaustive list of relationships that will resolve every case. As other courts have observed, "no simple judicial formula can adequately capture the precise contours of the 'in connection with' requirement, particularly in light of the myriad factual contexts in which the phrase might come into play . . . ."

219 F.3d at 284 (quoting *United States v. Wyatt*, 102 F.3d 241, 247 (7th Cir. 1996)); *see also United States v. Thompson*, 32 F.3d 1, 6 (1st Cir. 1994) ("[I]t is difficult to sketch the outer boundary" of the relationship expressed by the phrase.).

The District Court found that DeJesus had a firearm in his right jacket pocket when he was arrested 10 to 15 minutes after he stole Rivera's car, and that "the unloaded .380 semi-automatic, chrome with black handle, presents an intimidating sight, whether loaded or unloaded." (App. at 272). In addition, the District Court found that DeJesus stole the car from a residential street where it was likely that he would encounter someone. *Id.* at 273. Finally, the District Court found that DeJesus' mindset at the time was extremely adverse to being apprehended. *Id.* The District Court also stated that the crime of car theft is one that is logically connected to the possession of a firearm. *Id.* at 273. Based on these observations, the District Court inferred that DeJesus would have used the firearm for the purpose of intimidating any person who "tried to intervene in his car thievery and escape," and thus that the possession emboldened him and facilitated the theft. *Id.* at 272.

DeJesus argues that the District Court's conclusion that his possession of a firearm facilitated the car theft or emboldened him to commit the theft was not supported by sufficient evidence in the record. Specifically, DeJesus asserts that the weapon "was found on the defendant, but it was not loaded and he never employed the firearm during or in relation to the theft." (DeJesus' Opening Brief at 45). Moreover, "there was no evidence indicating that [he] . . . would have drawn his weapon if confronted during the course of the theft. In fact, in the entire time the police were pursuing the defendant, [he] . . . never once reached for or drew his weapon." *Id.*

At sentencing the government only has to prove guideline enhancements by a preponderance of the evidence. *United States v. Dorsey*, 174 F.3d 331, 332 (3d Cir.), *cert. denied*, 528 U.S. 885 (1999). The District Court found that the government met that burden in this case, and we will not disturb that conclusion unless we find that it is clearly

erroneous. *United States v. Pitt*, 193 F.3d 751, 764 (3d Cir. 1999).

The District Court's conclusion is not clearly erroneous. The District Court's findings that DeJesus possessed an unloaded firearm when he was arrested; that the weapon was an intimidating sight even when unloaded; that DeJesus stole the car on a residential street where he might have been approached; and that DeJesus' mindset was adverse to being apprehended have ample support in the record and are unrefuted by DeJesus on appeal. DeJesus only challenges the inferences drawn by the District Court on the basis of these unrefuted facts. But factfinders "routinely, and permissibly, draw inferences when they are evaluating a witness's credibility." *Loney*, 219 F.3d at 288. And here, the inferences drawn by the District Court were quite reasonable. DeJesus was carrying an intimidating firearm in his jacket pocket while stealing a car from a residential neighborhood. The most natural inference is that he was carrying the weapon in order to facilitate the theft. While there are other possible inferences, we will not second guess the perfectly reasonable one drawn by the District Court.

The District Court's inference is consistent with inferences drawn by this Court and others while considering the applicability of U.S.S.G. § 2K2.1(b)(5). *See e.g. Loney*, 219 F.3d at 288 (holding that simultaneous possession of semi-automatic pistol and 29 packets of heroin satisfied the "in connection with" requirement); *United States v. Rhind*, 289 F.3d 690, 694-95 (11th Cir. 2002) (enhancement appropriate even though guns were not loaded because availability and appearance of firearms promoted the crime), *cert. denied*, ___ U.S. ___, 123 S.Ct. 869 (2003); *United States v. Sturtevant*, 62 F.3d 33, 34 (1st Cir. 1995) (per curiam) (holding that requirement satisfied where defendant possessed a firearm during an assault but never threatened the victim with the gun because weapon provided an added sense of security and had a substantial potential for use); *United States v. Routon*, 25 F.3d 815, 819 (9th Cir. 1994) (holding that requirement satisfied when "the firearm was possessed in a manner that permits an inference that it facilitated or potentially facilitated — i.e.,

had some potential emboldening role in — a defendant's felonious conduct."). Like the defendants in *Loney*, *Rhind*, *Sturtevant*, and *Routon*, DeJesus' possession of a firearm served to embolden or facilitate the commission of another felony offense despite the fact that he did not actually draw the firearm.

In sum, "the phrase 'in connection with' requires that there be some relationship between the gun and the felony." *Loney*, 219 F.3d at 286. The evidence in this case shows that there was a sufficient relationship between DeJesus' possession of a firearm and his theft of a car to warrant the four-level adjustment under U.S.S.G. § 2K2.1(b)(5).

## IV. Conclusion

For the aforementioned reasons, we affirm DeJesus' conviction and sentence.

STAPLETON, Circuit Judge, dissenting:

I concur with the Court's disposition of DeJesus's claim charging that the government exercised racially-based peremptory challenges. I further agree that the District Court did not abuse its discretion in sentencing DeJesus. However, I am unable at this point to conclude that the prosecution's peremptory challenges of jurors Bates and McBride involved no violation of the Equal Protection Clause.

As the Court correctly points out, peremptory challenges exist so that a litigating party may excuse a potential juror it believes is less desirable than other potential jurors, even though the party cannot meet the burden of having the juror removed for cause. Peremptory challenges are necessarily based on speculation that particular traits, characteristics, conduct, or personal experiences of a prospective juror bear a correlation to a bias or quality that the party exercising the strike deems undesirable in a juror. In short, the process enables attorneys to engage in stereotyping when utilizing the peremptory challenges that they have been allotted.

The Supreme Court, however, has identified characteristics that may not, consistent with the Equal Protection Clause, be used as a basis for peremptory challenges. Race-based peremptory challenges were ruled out in *Batson v. Kentucky*, 476 U.S. 79 (1986). Thereafter, in *J.E.B. v. Alabama*, 511 U.S. 127 (1994), the Court concluded that gender-based stereotypes may not be used as a basis for a peremptory challenge. This is true even if the purported bias or quality inferred in accordance with the stereotype would, standing alone, be a permitted consideration for exercising a peremptory challenge. Thus, a litigant, like the plaintiff in *J.E.B.*, may not infer solely from the fact that a prospective juror is male that he will be likely to side with a defendant in a paternity suit and then base a peremptory challenge on that inference.

As our Court recently noted in *Rico v. Leftridge-Byrd*, 340 F.3d 178, 182 (3d Cir. 2003), "The *J.E.B.* majority explicitly grounded its decision on its conclusion that the Equal Protection Clause bars peremptory challenges based on

gender and, it strongly suggested, on any classification otherwise receiving 'heightened scrutiny' under the Clause."[1] Based on that strong suggestion, I would hold that the Equal Protection Clause bars the use of stereotypes based upon religion in exercising peremptory challenges. When state action "establishes 'a classification [that] . . . is drawn upon inherently suspect distinctions such as race, religion, or alienage' . . . , it must meet the strict scrutiny standard. . . ." *Schumacher v. Nix*, 965 F.2d 1262, 1266 (3d Cir. 1992) (quoting from *City of New Orleans v. Dukes*, 427 US 297, 303 (1976)); *DeHart v. Horn*, 227 F.3d 47, 61 (3d Cir. 2000) (en banc) (citing *Maldonado v. Houstoun*, 157 F.3d 179, 184 (3d Cir. 1998), for the proposition that a "classification that draws upon suspect distinctions, such as religion, is subject to strict scrutiny") (internal quotations omitted).

---

1. The Court's analysis is reflected in the following observations:

> Under our equal protection jurisprudence, gender-based classifications require "an exceedingly persuasive justification" in order to survive constitutional scrutiny. Thus, the only question is whether discrimination on the basis of gender in jury selection substantially furthers the State's legitimate interest in achieving a fair and impartial trial. In making this assessment, we do not weigh the value of peremptory challenges as an institution against our asserted commitment to eradicate invidious discrimination from the courtroom. Instead, we consider whether peremptory challenges based on gender stereotypes provide substantial aid to a litigant's effort to secure a fair and impartial jury.

*J.E.B.*, 511 U.S. at 136-37 (citations and footnotes omitted). After concluding that a litigant's interest in using peremptory challenges based on gender stereotype did not provide "an exceedingly persuasive justification," the Court explained what remained of peremptory challenges:

> Our conclusion that litigants may not strike potential jurors solely on the basis of gender does not imply the elimination of all peremptory challenges. Neither does it conflict with a State's legitimate interest in using such challenges in its effort to secure a fair and impartial jury. Parties still may remove jurors who they feel might be less acceptable than others on the panel; gender simply may not serve as a proxy for bias. Parties may also exercise their peremptory challenges to remove from the venire any group or class of individuals normally subject to "rational basis" review.

*J.E.B.*, 511 U.S. at 143.

One may peremptorily strike a juror for being inarticulate or uneducated. But one may not, I believe, assume that because a prospective juror is of a particular race, gender, or religion, he is inarticulate or uneducated, and then base a peremptory strike on that assumption. Similarly, a prosecutor may undoubtedly strike a juror for being unwilling to sit in judgment of another human being. However, a prosecutor may not, consistent with the Equal Protection Clause, infer solely from a prospective juror's race, gender, or religion that he will be unwilling to sit in judgment of another, and then offer that unwillingness as a permissible basis for a peremptory challenge.

This does not mean that a litigant may not peremptorily strike a juror because of a belief that happens to have a religious basis. But a litigant cannot use a juror's religious affiliation or practice as the sole basis for attributing such a particular belief to the juror. Here, the voir dire transcript reveals no indication from either McBride or Bates that they would be reluctant to convict or pass judgment on another human being. If they had exhibited such a reluctance, the government clearly would have been able to use such a belief, regardless of whether it had a religious basis, as the reason behind a peremptory strike. However, both McBride and Bates indicated precisely the opposite of any such unwillingness: that they would follow the law and base a verdict only on the evidence in the case.

The record makes clear that the sole basis for the government's belief that such reluctance existed was the fact that McBride and Bates were heavily involved in the practice of their religious faith. What the government did was to assume that individuals heavily involved in the practice of their religious faith, as a class, are likely to be reluctant to sit in judgment of others. This is precisely the kind of stereotyping that I believe is foreclosed by the teachings of *J.E.B.*[2] The Court concludes, as did the District

---

2. As the Court concedes, the only "fair inference" to be drawn from the record is that Bates and McBride were Christians, and it well may be that their specific religious affiliation played a role in the prosecutor's decision. It is unnecessary to resolve that issue, however. Whether the prosecutor's conclusion about unwillingness to sit in judgment was based on Bates's and McBride's involvement in the practice of religion or, more particularly, on their involvement in their Christian faith, their exclusions from jury service were based on a suspect religious classification giving rise to heightened scrutiny.

Court, that even though striking a juror on account of his religious affiliation may violate Equal Protection, striking him because of his "heightened religious involvement rather than a specific religious affiliation" does not. Slip Op. p. 2. I cannot agree. A classification based on "heightened religious involvement" is no less a classification based on religion than is a classification based on religious affiliation. The government has proffered no authority from Equal Protection or Free Exercise jurisprudence suggesting the contrary and I am aware of none. Once a prosecutor begins discriminating against individuals because they engage in religious activities (regardless of what religion they are or the degree to which they engage in those activities), or because they are non-religious (or engage in only a limited number of religious activities), the prosecutor's actions must be subjected to heightened scrutiny.

Because the prosecution discriminated against Bates and McBride on account of their practice of their religion, I would reverse the judgment of the District Court. At the same time, I agree with the Court that neutral grounds for striking McBride and Bates may have played a role in the prosecutor's decisions. McBride indicated that he had learned to forgive his cousin's killer, and the prosecution asserted that Bates diverted his eyes from the prosecution during voir dire. Therefore, I would remand this case to the District Court for a mixed motive analysis consistent with our decision in *Gattis v. Snyder*, 278 F.3d 222, 234-35 (3d Cir. 2002).

A True Copy:
        Teste:

*Clerk of the United States Court of Appeals
for the Third Circuit*