

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-20-2006

# USA v. Andujar

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-1801

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"USA v. Andujar" (2006). *2006 Decisions.* Paper 65.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/65

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-1801

———

UNITED STATES OF AMERICA

v.

EDWARD ANDUJAR,

Appellant

———

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Criminal No. 03-331-1)
District Judge: Honorable Freda L. Wolfson

———

Submitted Pursuant to Third Circuit LAR 34.1(a)
December 12, 2006

Before: FUENTES and VAN ANTWERPEN, <u>Circuit Judges</u>, and PADOVA,*
<u>District Judge</u>.

(Filed December 20, 2006)

———

OPINION OF THE COURT

———

_____

*The Honorable John R. Padova, District Judge of the Eastern District of Pennsylvania,
sitting by designation.

VAN ANTWERPEN, *Circuit Judge*.

Appellant Edward M. Andujar, M.D., was convicted by a jury on February 6, 2004, of one count of bankruptcy fraud in violation of 18 U.S.C. § 152(3), and 22 counts of failure to file tax returns in violation of 26 U.S.C. § 7203. On February 18, 2005, the District Court sentenced Andujar to a term of 18 months' imprisonment.

Andujar raises three issues on appeal. First, he contends the District Court erred in denying his motion to suppress documents obtained by a warrantless search of his rented storage locker and a second motion to suppress government trial exhibits he claims were the fruit of that illegal search. Second, Andujar raises a challenge under *Batson v. Kentucky*, 476 U.S. 79 (1986), to the government's peremptory strike of a Latino juror during voir dire. Third, Andujar argues the District Court abused its discretion under Federal Rules of Evidence 404(b) and 403 by admitting extensive evidence of Andujar's tax filing history that was not charged in the indictment.

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742. We will affirm.

## I. Factual Background

Because we write solely for the parties, we set forth only those facts necessary to our analysis.

Andujar, a 1985 graduate of Harvard Medical School, was the president and sole

shareholder of Medi-One Stop, Inc., a family medical practice in New Jersey.[1]  On

January 28, 1998, the FBI served Andujar with a grand jury subpoena *duces tecum*,

ordering him to turn over all business records related to his bankrupt medical practices as

well as his then-existing practice, Medi-One Stop, by February 10, 1998.  On February 9,

1998, Andujar filed bankruptcy petitions on behalf of himself and Medi-One Stop.  In

filling the corporate bankruptcy petition, Andujar failed to disclose material financial

information.  Three days after filling for bankruptcy, Andujar began operating a new

medical practice called Dr. Eddie's Health & Nutrition, Inc.

On February 11, 1998, FBI agents went to Andujar's medical office in an attempt

to obtain the subpoenaed records.  Andujar informed the agents he no longer had control

over the records because they had become property of the bankruptcy estate upon the

filing of the bankruptcy petition.  However, Andujar allowed the government to place a

padlock on a truck into which he had moved the records and, later, to padlock the storage

unit to which the records were transferred.  The government retained the key to the

padlocked storage unit until the time of the search at issue here.

On April 8, 1998, the FBI served a subpoena *duces tecum* on Thomas Subranni,

the bankruptcy trustee of Medi-One Stop and, therefore, legal titleholder of the corporate

---

[1]Prior to the incorporation of Medi-One Stop, Inc. in 1990, Andujar practiced
medicine through a number of related medical practice corporations, for all of which he
was the sole owner:  Medi-Plus Marlton, Inc., Medi-Plus Deptford, Inc., Medi-Plus
Vineland, Inc., and Medi-Stop, Inc.  In February 1995, Andujar filed bankruptcy petitions
on behalf of each of these entities.

documents. The government obtained a letter from Subranni consenting to the seizure of Medi-One Stop documents. On April 9, 1998, the government seized the documents, without a warrant, from Andujar's rented storage unit.[2]

On August 26, 2003, a federal grand jury returned a 24-count superseding indictment charging Andujar with one count of bankruptcy fraud, one count of giving false testimony in a bankruptcy proceeding, five counts of failure to file individual tax returns, five counts of failure to file corporate tax returns, and 12 counts of failure to file employer quarterly tax returns. On August 8, 2003, Andujar filed a motion to suppress the documents seized from his rented storage unit. The District Court held a suppression hearing on October 8, 2003, and denied the motion on October 31, 2003.

On November 13, 2003, Andujar filed a second motion seeking to suppress various government trial exhibits as "fruit of the poisonous tree." He claimed the April 9, 1998 search was the underlying illegality from which the government obtained these trial exhibits. The District Court denied the motion on December 15, 2003. On February 6, 2004, a jury convicted Andujar of bankruptcy fraud and 22 counts of failure to file individual tax returns, corporate tax returns, and employer quarterly tax returns.[3] This

---

[2]The record is unclear whether and to what extent the government obtained business documents related to Andujar's other medical practice corporations during the April 9, 1998 seizure. However, during the October 8, 2003 suppression hearing, the government agreed not to use any documents seized from the storage locker that did not pertain to Medi-One Stop.

[3]Andujar was acquitted of giving false testimony in a bankruptcy proceeding.

appeal followed.

## II. Analysis

### A. *Motions to Suppress*

Andujar appeals the District Court's denial of his motion to suppress evidence seized by the government on April 9, 1998 from his rented storage locker, arguing the warrantless search of the storage unit, as distinguished from the seizure of documents over which he did not have legal title, violated the Fourth Amendment. He also appeals the District Court's denial of his second motion, in which he sought to suppress certain government trial exhibits under the "fruit of the poisonous tree" doctrine. We review the District Court's order denying the motions to suppress "for clear error as to the underlying facts, but exercise plenary review as to its legality in the light of the court's properly found facts."[4] *United States v. Inigo*, 925 F.2d 641, 656 (3d Cir. 1991).

To raise a successful Fourth Amendment challenge, the defendant bears the burden of proving that he had a reasonable expectation of privacy in the place searched. *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980). The defendant must show both that he

---

[4]The government contends the plain error standard applies because Andujar failed to raise the specific Fourth Amendment argument presented here to the District Court. The argument now advanced by Andujar was made, albeit briefly, in a supplemental letter to the District Court dated October 7, 2003. Furthermore, the District Court alluded to the Fourth Amendment search issue in its October 31, 2003 opinion. We recognize that Andujar did not make this specific argument during the October 8, 2003 suppression hearing. However, we need not decide whether the brief statement in the supplemental letter, without more, is sufficient to avoid plain error review because we reach the same result under both standards.

had a subjective expectation of privacy and that the expectation was one society would recognize as reasonable. *Minnesota v. Carter*, 525 U.S. 83, 88 (1998). Furthermore, when a defendant clearly disavows ownership or control of his property he can thereby surrender the Fourth Amendment protection that would otherwise extend to him. *See United States v. Fulani*, 368 F.3d 351, 354-55 (3d Cir. 2004) ("[Defendant's] explicit denial of ownership of the bag . . . coupled with his two implicit denials . . . show [his] clear and unequivocal abandonment of his privacy interest in the . . . bag."); *Government of the Virgin Islands v. Williams*, 739 F.2d 936, 938 (3d Cir. 1984). ("There is . . . no recognition of the legitimacy of a defendant's expectations of privacy where the area searched is in the control of a third party."). *See also United States v. Torres*, 949 F.2d 606, 607 (2d Cir. 1991) ("It is well settled that an otherwise legitimate privacy interest may be lost by disclaiming or abandoning property, especially when actions or statements disavow any expectation of privacy.").

Andujar did not carry his burden to show a reasonable expectation of privacy in the storage unit the government entered to seize documents related to Medi-One Stop. Andujar informed the FBI that the storage unit contained documents that were the subject of a lawful subpoena related to the investigation into his bankrupt medical practices. As a bankruptcy debtor, he had a reduced expectation of privacy in such documents. *See In re Barman*, 252 B.R. 403, 414 (E.D. Mich. 2000) (noting "debtors who have filed for bankruptcy relief must have a significantly reduced expectation of privacy in their 'houses, papers, and effects' that society is prepared to recognize as reasonable").

Because of his actions, Andujar did not have a reasonable expectation of privacy in either the contents of the storage unit or the storage unit itself. First, Andujar disclaimed legal title to the contents stored in his rented unit, acknowledging that title to the documents had vested, by operation of law, in the bankruptcy trustee. *See United States v. Lyons*, 898 F.2d 210, 213 (1st Cir. 1990) (stating "[b]y placing personal effects inside the storage unit, Lyons manifested an expectation that the *contents* would be free from public view") (emphasis in original). The District Court found "no evidence that defendant ever attempted to prevent Trustee Subranni from obtaining the documents." Appellant's App. at 11.

Furthermore, Andujar could not have had a reasonable expectation of privacy in the storage unit itself because he affirmatively consented to FBI agents placing a padlock on the storage unit and retaining the only key. As such, Andujar could not access the storage unit without contacting the agents to let him into the facility. *Compare United States v. Speights*, 557 F.2d 362, 363 (3d Cir. 1977) (police officer had reasonable expectation of privacy in locker where police department did not have duplicate key or combination to his private lock and there was no regulation or notice that lockers might be searched) *with Massachusetts v. Lanigan*, 423 N.E.2d 800, 801-02 (Mass. App. Ct. 1981) (defendant did not have reasonable expectation of privacy in apartment he abandoned upon finding it had been padlocked by police). In addition, the District Court found that Andujar, who was represented by counsel, was given notice of the impending search, sent his employee down to witness the search, and did not object to agents

-7-

entering the storage unit. This finding undermines any subjective expectation of privacy Andujar claims to have had in the storage unit.

Andujar argues that consent to the padlock is not indicative of his lack of a subjective expectation of privacy, but that it merely demonstrates "his willingness to ensure that the documents would not be tampered with or moved prior to their later delivery under the subpoena." Appellant's Reply Brief at 5. However, Andujar, who bears the burden of proving an actual and subjective reasonable expectation of privacy, offers no evidence on the record to support this interpretation of the facts. Moreover, the District Court found that Andujar's consent to the FBI padlock evidenced his lesser expectation of privacy in the storage unit.

In light of the totality of the circumstances, Andujar did not carry his burden of showing that he reasonably believed the padlocked storage unit would remain free from governmental intrusion. Accordingly, his Fourth Amendment rights were not violated.

Andujar also appeals the District Court's denial of his second motion to suppress certain government trial exhibits under the "fruit of the poisonous tree" doctrine, citing the April 9, 1998 search of his rented storage unit as the underlying illegality. Because we conclude the April 9, 1998 search did not violate the Fourth Amendment, this claim must fail.

*B.* Batson *Challenge*

Andujar, who is Latino, argues the District Court's decision to allow the peremptory strike of the first Latino juror (Juror No. 3) in the venire pool was erroneous

under *Batson v. Kentucky,* 476 U.S. 79 (1986).[5] We review the District Court's findings of fact on a *Batson* challenge for clear error. *United States v. Milan*, 304 F.3d 273, 281 (3d Cir. 2002). We will accept the District Court's factual determination unless it "either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data." *Haines v. Liggett Group, Inc.*, 975 F.2d 81, 92 (3d Cir. 1992) (quoting *Krasnov v. Dinan*, 465 F.2d 1298, 1302 (3d Cir. 1972)).

In *Batson*, the Supreme Court held that discriminatory use of a peremptory challenge during jury selection violates Equal Protection. *Batson*, 476 U.S. at 89. The Court subsequently announced a three-part test to clarify the procedure for determining whether a peremptory strike offends Equal Protection:

> "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' . . . Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. . . . Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.'"

*Johnson v. California*, 125 S.Ct. 2410, 2416 (2005) (quoting *Batson*, 476 U.S. 83-84) (internal citations omitted).

Primarily, Andujar argues the District Court was clearly erroneous in accepting the

---

[5]The parties have used different terms ("Hispanic" and "Latino") at trial and in their briefs to this Court to describe the ethnicity of Andujar and Juror No. 3. We make no attempt to distinguish the terms in this opinion and will use the term "Latino" in deference to the terminology preferred by Andujar before this Court.

government's race-neutral justification that Juror No. 3 was struck because she hesitated when asked whether or not she would have difficulty finding a doctor guilty of a crime. In *Hernandez v. New York*, the Supreme Court upheld the government's peremptory strike of two jurors who, according to the government, were stricken because they answered questions "with some hesitancy." 500 U.S. 352, 356 (1991) (plurality opinion). In reaching its conclusion, the Court determined that "the best evidence often will be the demeanor of the attorney who exercises the challenge." *Id.* at 365. The Court emphasized that "evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'" *Id.* (citing *Wainwright v. Witt*, 469 U.S. 412, 428 (1985)).

Here, we cannot say the District Court was clearly erroneous in crediting the prosecutor's facially neutral reason for striking Juror No. 3. Foremost, the District Court was in the best position to evaluate the prosecutor's demeanor, evidence the Supreme Court has deemed of critical importance to a credibility determination in a factually similar case. *Hernandez*, 500 U.S. at 356.

Furthermore, the record supports the District Court's determination. The colloquy between the District Court and Juror No. 3 is strong evidence that Juror No. 3 hesitated in response to the question at issue. In offering his reason for the strike, the prosecutor stated: "We never felt comfortable with her hesitation. . . . and based on that, we don't feel comfortable with her on the jury." Appellant's App. at 30. Andujar does not dispute that Juror No. 3 hesitated, but suggests the hesitation was the result of a poorly-worded

-10-

question, emphasizing that Juror No. 3 did not hesitate after the question was restated more clearly. However, at least an equally plausible explanation is that Juror No. 3 was uncertain of her ability to find a doctor guilty of a crime. Moreover, even if Juror No. 3's hesitation was in fact a result of her confusion over a poorly worded question, that does not compel the conclusion that the prosecutor had a discriminatory motive in striking her. *See United States v. DeJesus*, 347 F.3d 500, 505 (3d Cir. 2003) (explaining that the decision to exercise a peremptory challenge "is usually based on educated guesses about probabilities based on the limited information available to an attorney about prospective jurors").

Additionally, a Latino juror was ultimately seated on the jury and the government had four peremptory strikes remaining. The fact that another minority juror was ultimately seated on the final jury does not defeat a *Baston* claim. *United States v. Clemons*, 843 F.2d 741, 747 (3d Cir. 1988). However, we have found that inclusion of minority jurors in the final jury, where the government retains additional peremptory strikes, is a factor that makes the government's race-neutral explanation more believable. *DeJesus*, 347 F.3d at 509.

We give great deference to the District Court's decision to credit the prosecution's justification for striking Juror No. 3. *Hernandez*, 500 U.S. at 364 (instructing reviewing courts to give "great deference" to a trial judge's findings on credibility). After reviewing the record, we cannot say the District Court's finding that the prosecutor had a non-discriminatory motive for striking Juror No. 3 was "completely devoid of minimum

evidentiary support displaying some hue of credibility."[6] *Haines*, 975 F.2d at 92 (quoting *Krasnov*, 465 F.2d at 1302).

Andujar also contends the District Court failed to follow the proper legal standard for finding a prima facie case under step one of *Batson* because it expressed doubt that a single strike of a minority juror could establish a prima facie case. Because the District Court nevertheless required the prosecutor to provide a race-neutral explanation for the strike (step two) and made a ruling on the ultimate issue of intentional discrimination (step three), this argument is moot. *See Hernandez,* 500 U.S. at 356 (finding the preliminary issue of whether a defendant has made out a prima facie case moot once the prosecutor offers a race-neutral explanation and the trial court rules on the issue of intentional discrimination).

Finally, Andujar argues the District Court failed to follow the procedure outlined in *Johnson* because it did not reach step three of *Batson* (the ultimate question of intentional discrimination), but simply evaluated the persuasiveness of his prima facie case against the government's proffered justification. The record does not support this assertion. After listening to argument from both the government and Andujar's counsel, the District Court stated: "I do believe the explanation given by [the prosecutor] is

_____

[6]We recognize that the District Court had a misrecollection with respect to a conversation at sidebar regarding Juror No. 3. However, we are mindful that we review a cold record and that the District Court was in the best position to judge the credibility of the prosecutor in offering his reason for the strike, a finding that is not undermined by this mistaken recollection.

-12-

sufficient to rebut that." Appellant's App. at 32. The District Judge found the prosecutor's proffered reason for the strike genuine and credible, necessarily leading to the conclusion that Andujar had failed to prove purposeful racial discrimination.[7] *See DeJesus*, 347 F.3d at 507 (holding District Court properly found no purposeful racial discrimination under step three of *Batson* upon finding the prosecution's proffered reasons for the peremptory strike "true and sincere").

In sum, the District Court did not clearly err in rejecting Andujar's *Batson* claim.

### C. Federal Rules of Evidence 404(b) and 403

Andujar argues the District Court abused its discretion in admitting voluminous evidence of his tax filing history for a period of time not covered by the indictment in violation of Federal Rules of Evidence 404(b) and 403. The government contends the evidence was admissible as direct evidence of Andujar's willfulness, and, in the alternative, was properly admitted as evidence of intent and absence of inadvertence or mistake under Rule 404(b). The District Court found the evidence admissible as direct evidence of the crime charged and, in the alternative, as highly probative evidence of willfulness under Rule 404(b). We review the District Court's decision to admit evidence

---

[7]In addition to the proffered reason given by AUSA DiLeonardo (that Juror No. 3 hesitated), AUSA Rudy offered several additional reasons, on behalf of the government, for striking Juror No. 3. Because the record clearly shows the District Court credited the explanation given by Mr. DiLeonardo in reaching its decision, we review only this ground.

of prior "bad acts" under Rule 404(b) for abuse of discretion.[8] *United States v. Daraio,* 445 F.3d 253, 259 (3d Cir. 2006).

Rule 404(b) governs the admissibility of evidence of "other crimes, wrongs, or acts." It states, in relevant part, the following: "Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." In *United States v. Daraio*, we laid out a four-part test to determine the admissibility of Rule 404(b) evidence: "(1) the evidence must have a proper purpose; (2) it must be relevant; (3) its probative value must outweigh its potential for unfair prejudice; and (4) the court must charge the jury to consider the evidence only for the limited purposes for which it is admitted." 445 F.3d at 264 (quoting *United States v. Givan*, 320 F.3d 452, 460 (3d Cir. 2003)).

Andujar was charged with 22 counts of failure to file tax returns under 26 U.S.C. § 7203, which includes willfulness as an element of the crime. In *Daraio*, we held that "[i]n cases involving violations of federal tax laws such as tax evasion, '[a] defendant's past taxpaying record is admissible to prove willfulness circumstantially.'" 445 F.3d at 264 (quoting *United States v. Ringwalt*, 213 F.Supp.2d 499, 506 (E.D. Pa. 2002)).

---

[8]Because we find the evidence admissible under Rule 404(b), the ground on which Andujar focuses in his brief to the Court, we need not decide whether it would be admissible on separate grounds as direct evidence of the crime charged pursuant to *United States v. Retos*, 25 F.3d 1220, 1227-28 (3d Cir. 1994).

Accordingly, the government's introduction of Andujar's tax filing history to prove willfulness was admitted for a proper purpose and was relevant to establishing an element of the crime charged. This is especially true in light of Andujar's asserted defense at trial that he did not willfully, maliciously, or intentionally fail to file his tax returns.

Moreover, the District Court did not abuse its discretion in determining that the probative value of the tax history evidence was not substantially outweighed by undue prejudice to Andujar. We have said that the District Court's discretion "is construed especially broadly in the context of Rule 403." *United States v. Mathis*, 264 F.3d 321, 327 (3d Cir. 2001). Contrary to Andujar's claim, "the number of uncharged acts alleged, even if disproportionate to the number of charged acts, does not alone render admission of such evidence an abuse of discretion." *Id.* (finding admission of eleven uncharged robberies in a case seeking conviction of only one did not amount to an abuse of discretion under Rule 403). *See also Daraio*, 445 F.3d at 256, 266 (admitting evidence of prior tax history spanning 14 years was not an abuse of discretion). The District Court found that the prior history was "important and relevant to the issue of willfulness" and that it "certainly outweighs any prejudicial impact." Appellant's App. at 213. On this record, we cannot say that the District Court abused its discretion in admitting the Rule 404(b) evidence concerning Andujar's prior tax history.[9]

_____

[9]The District Court was prepared to give a limiting instruction regarding the evidence of Andujar's prior tax history, as required by Rule 404(b). However, for strategic reasons, Andujar's counsel declined to have the trial judge give this instruction.

### III.  Conclusion

We have considered all other arguments made by the parties on appeal, and conclude that no further discussion is necessary.  For the foregoing reasons, we will affirm Andujar's conviction and sentence.